Robert BERTOTTI and Carole
Bertotti, Plaintiffs,

v.

CHARLOTTE MOTOR SPEEDWAY,
INC. and World Karting Association,
Inc., Defendants.

No. 3:93CV125–MU.

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 18, 1995.

David Wm. Boone, Atlanta, GA and Rodney Toth, Charlotte, NC, for plaintiffs.

James G. Middlebrooks, Stephen D. All-red, Smith, Helms, Mullis & Moore, Charlotte, NC, and J. Neil Robinson, Petree Stockton, Charlotte, NC, for defendants.

## ORDER

MULLEN, District Judge.

This matter is before the Court upon joint motion of the defendants World Karting Association ("WKA") and Charlotte Motor Speedway ("the Speedway") for summary judgment and joint motion to strike the affidavit of John C. Fitch, submitted by the plaintiffs in response to the defendants' motion for summary judgment. For the reasons stated herein, the Court will grant the defendants' joint motion for summary judgment and joint motion to strike.

## FACTS

This diversity action arose out of an accident that occurred in April of 1990 when plaintiff Robert Bertotti participated in an Enduro class go-kart race sponsored by WKA, held at the Speedway.[1] During the race, Mr. Bertotti lost control of his race kart when the left wheels of the kart dropped off the asphalt track as he came out of Turn 3. The kart struck hay bales that had been set up about 20 feet from the race track as crash barriers a few yards in front of a guardrail. The race kart spun into the guardrail, and Mr. Bertotti suffered a spinal cord injury that left him partially paralyzed. Mr. Bertotti seeks compensatory and punitive damages against both WKA and the Speedway for liability resulting from his injury, claiming that the negligence and gross negligence of both defendants caused his injury. Mrs. Bertotti has sued the defendants alleging loss of consortium.[2]

In their motion for summary judgment, defendants argue that the plaintiffs' lawsuit is barred because plaintiffs both signed enforceable release and waiver of liability and indemnity agreements that release the defendants from all claims of liability. Furthermore, defendants argue that there is no evidence to support plaintiffs' allegations that defendants' alleged negligent conduct amounts to gross negligence.

## DISCUSSION

Summary judgment should be granted "if the pleadings, depositions, and answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ..." Fed.R.Civ.P. 56(c). Thus, when there are no genuine issues of material fact in dispute the defendant is entitled to summary judgment as a matter of law.

■■■ Under North Carolina law, parties are free to allocate the risk of injury by means of exculpatory contracts, unless the subject matter of such contracts affects a public interest. See *Gibbs v. Carolina Power & Light Co.,* 265 N.C. 459, 144 S.E.2d 393 (1965); *Hall v. Sinclair Refining Co., Inc.,* 242 N.C. 707, 89 S.E.2d 396 (1955). While North Carolina courts have stated that such exculpatory agreements should be strictly construed against the party seeking to enforce them, courts have refused to enforce exculpatory agreements only in circumstances that involve a public service or public interest. See *Hall,* 242 N.C. at 709–710, 89 S.E.2d at 397–398. Moreover, courts in other jurisdictions have recognized that exculpatory contracts entered in connection with motor sports events do not violate public policy because such contracts do not involve public interests. See, e.g., *Seaton v. East Windsor Speedway, Inc.,* 400 Pa.Super. 134, 139, 582 A.2d 1380, 1382–83 (1990) (finding that racing does not involve public interests and enforcing a pre-race release); *Dunn v. Paducah Int'l Raceway,* 599 F.Supp. 612, 613 (W.D.Ky.1984) (same).

---

**1.** Enduro class race karts have steel frames covered with fiber glass bodies. The karts are built low, with the lowest part of the frame only two to three inches above the ground. The driver lies on his back in the kart and races it from a virtually prone position with his helmet a few inches higher than the steering wheel. Enduro karts can reach speeds of over 100 miles per hour.

**2.** Mrs. Bertotti also sued for negligent infliction of emotional distress, but later withdrew that claim.

Only one reported opinion in North Carolina has addressed the enforceability of a release entered into prior to a race. In *Johnson v. Dunlap*, 53 N.C.App. 312, 280 S.E.2d 759 (1981), *cert. denied*, 305 N.C. 153, 289 S.E.2d 380 (1982), an auto racer was hit by a race car while he was standing in the pit area of the race track. The defendants claimed that the plaintiff had signed two releases. The first release, defendants asserted, was signed before the race while plaintiff was in his car at the entrance to the pit area of the race track. Plaintiff, however, denied that he had actually seen the document. Moreover, the two men who were with the plaintiff in his car when he entered the pit area testified that they had seen and signed a page containing signature lines on a legal pad, but not a release agreement. Only the plaintiff's signature, but not the signature of those who were with him, appeared on the release offered by the defendants in *Johnson*. The defendants also claimed that the plaintiff had signed a second release while he was in the hospital recovering from the amputation of his leg. There was ample evidence that the plaintiff was taking painkillers and narcotics at the time he was presented with the second release and that he was incompetent when he signed it.

At trial, the jury found that the plaintiff had not released the defendants and returned a verdict for the plaintiff. The trial court, however, granted a J.N.O.V. for the defendants and ordered a new trial on the grounds that the evidence was not sufficient to support the verdict and that the verdict was contrary to the evidence. The North Carolina Court of Appeals reversed.

The Court of Appeals ruled that the defendants relinquished their rights under the first pre-race release agreement when they presented the second post-injury release agreement to the plaintiff while he was in the hospital. *Id.* at 316, 280 S.E.2d at 762. The court also stated that the second, post-injury release agreement was unenforceable as a matter of law because there was ample evidence that the plaintiff was incompetent when he signed it. *Id.* at 317, 280 S.E.2d at 763.

The appellate court went on to say in dicta that the trial court erred by granting the J.N.O.V. because there was sufficient evidence from which the jury could find that the plaintiff "had never seen the [first] release or that the circumstances were such that he was not given an opportunity to read it." *Id.*

Significantly, the *Johnson* court did not question that such pre-race releases are enforceable. The court did not characterize the release as an adhesion contract involving unequal bargaining power and did not hold that such contracts involved a public interest. Thus, *Johnson* strongly implies that when a party has the opportunity to see and read a pre-race exculpatory contract, the agreement is enforceable in North Carolina.

In this case, there is no dispute that the plaintiffs saw and voluntarily signed two separate Release Agreements. The Release Agreements provide in pertinent part that the releasor:

IN CONSIDERATION of being permitted to enter for any purpose any Restricted Area ... or being permitted to compete, ... observe, ... or for any purpose participate in any way in the event ...

1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoter, participants, racing association, sanctioning organization or any subdivision thereof, ... owners and lessees of premises used to conduct the event and each of them, their officers and employees, ... from all liability to the undersigned, his personal representatives, assigns, heirs, and next of kin for any and all loss or damage, and any claim or demands therefor on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releases or otherwise while the undersigned is in or upon the restricted area, and/or, competing, officiating in, observing, working for, or for any purposes participating in the event; ...

\*    \*    \*    \*    \*    \*

3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE DUE to the negligence

of releases or otherwise while in or upon the restricted area and/or while competing, officiating, observing, or working for or for any purpose participating in the event.

EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage. EACH OF THE UNDERSIGNED further expressly agrees that the foregoing release, waiver, and indemnity agreement is intended to be as broad and inclusive as permitted by the law of the Province or State in which the event is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements or inducements apart from the foregoing written agreement have been made.

The record indicates that the plaintiffs had ample opportunity to read the Release Agreements and to refuse to participate in the go-kart race if they chose. Both the plaintiffs testified in their depositions that they did not actually read the Agreements. Under North Carolina law, however, a party's failure to actually read a contract before signing it does not make the agreement unenforceable unless there is some evidence of mutual mistake, fraud or oppression. *See Mills v. Lynch,* 259 N.C. 359, 362, 130 S.E.2d 541, 543–44 (1963); *Harris v. Bingham,* 246 N.C. 77, 79, 97 S.E.2d 453, 454 (1957); *Biesecker v. Biesecker,* 62 N.C.App. 282, 285, 302 S.E.2d 826, 828 (1983). North Carolina courts have applied this rule rigorously:

> In this State it is held that one who signs a paper writing is under a duty to ascertain its contents and in the absence of showing that he was willfully misled or misinformed by the defendant as to these contents, or that they were kept from him in fraudulent opposition to his request, he is held to have

signed with full knowledge and assent as to what is therein contained.

*Harris,* 246 N.C. at 79, 97 S.E.2d at 454 (quoting *Williams v. Williams,* 220 N.C. 806, 18 S.E.2d 364 (1942)). Moreover, this rule has been applied repeatedly to enforce release agreements in North Carolina. *See Harrison v. Southern Ry. Co.,* 229 N.C. 92, 95, 47 S.E.2d 698, 700 (1948) (enforcing a post-injury release agreement despite the plaintiff's allegations that he did not read the agreement); *Watkins v. Grier,* 224 N.C. 339, 343, 30 S.E.2d 223, 225 (1944) (post-injury release held enforceable even though plaintiff alleged he did not actually read it); *Ward v. Heath,* 222 N.C. 470, 475–77, 24 S.E.2d 5, 9 (1943) (upholding a nonsuit enforcing a post-injury release agreement because there was no evidence of fraud or misrepresentation).

The plaintiffs herein have neither alleged nor come forward with evidence that the defendants obtained the signatures on the Release Agreements under circumstances that even remotely approach fraud, oppression or mutual mistake of the parties. As a matter of law their signatures show that they had full knowledge of and assented to the contents of the Releases. By signing the Release Agreements, plaintiffs expressly assumed the risk for injuries that occurred during the kart race even if those risks arose due to negligence on the part of the defendants.

Plaintiffs argue that the defendants had a duty to train the participants in the race to inspect the race facilities, that this duty was breached, and that the Release Agreements are unenforceable because they do not specifically address a breach of this "duty". Plaintiffs, however, cite no cases from North Carolina or any other jurisdiction that impose such a duty on the defendants. Plaintiffs also contend that the agreements are ambiguous and therefore unenforceable. The Court finds no ambiguity in the Releases as alleged by the plaintiffs. Even if the Court did find the existence of an ambiguity, however, it would merely be construed against the defendants, not render the entire agreement unenforceable, as the plaintiffs urge.

■ Plaintiffs further argue that a joint venture entered into by the State of North

Carolina and the Speedway to build a highway interchange near the track, and the designation of a facility which holds public auto race events as a special recreational district by statute, such that it is allowed special permits for the sale of alcohol, invokes the "public interest" exception to the well recognized rule of enforceability of exculpatory contracts. However, this exception applies only to entities or industries that are heavily regulated. *See Tatham v. Hoke*, 469 F.Supp. 914, 918 (W.D.N.C.1979), *aff'd*, 622 F.2d 587 (1980) (holding that exculpatory contracts between physician and patient are unenforceable because medicine is "heavily regulated by state authorities who have demonstrated the public interest in the activity"); *Alston v. Monk*, 92 N.C.App. 59, 64, 373 S.E.2d 463, 466–67 (1988), *review denied*, 324 N.C. 246, 378 S.E.2d 420 (1989) (holding exculpatory agreement with a cosmetology school unenforceable because cosmetology is a licensed activity "extensively regulated" by the State). North Carolina does not regulate the racing industry generally, much less the amateur kart racing industry. Thus, the Court finds that the narrowly tailored "public interest" exception has no application to this case.

In their Second Claim for Relief, plaintiffs allege that the defendants' conduct constituted gross negligence that merits punitive damages. Specifically, they allege that the defendants "knew or should have known prior to [Mr. Bertotti's] accident of the dangerous conditions of the track and inadequate barrier" and failed to make corrections or suspend the races. Plaintiffs argue that even if the Release Agreements are enforceable, that they only prevent recovery for ordinary negligence, not gross negligence. North Carolina courts have not addressed this issue and this Court finds it unnecessary to consider the issue, as the Court finds that defendants' conduct, as a matter of law, does not rise to the level of gross negligence.

■ Punitive damages may be awarded under North Carolina law if the defendant's negligent conduct rises to the level of gross, willful, or wanton negligence. Negligence is "gross, willful or wanton when the wrongdoer acts with conscious and intentional disregard of and indifference to the rights and safety of others." *Berrier v. Thrift*, 107 N.C.App. 356, 420 S.E.2d 206 (1992), *review denied*, 333 N.C. 254, 424 S.E.2d 918 (1993). The North Carolina Supreme Court has stated that punitive damages may be awarded in tort actions only where there are aggravating factors surrounding the defendant's negligence, such as "where the wrong is done willfully or under circumstances of rudeness, oppression or in a manner which evidences reckless and wanton disregard of the plaintiff's rights." *Hardy v. Toler*, 288 N.C. 303, 218 S.E.2d 342 (1975).

Plaintiffs contend that defendants were grossly negligent in acting or failing to act in five respects. They claim that defendants were grossly negligent in consciously 1) failing to set up appropriate crash barriers in Turns 3 and 4 where Mr. Bertotti lost control of his kart; 2) failing to train plaintiffs to inspect the track for adequacy of the crash barriers; 3) failing to employ "special safety engineering personnel to consider what would constitute a 'safe' barrier system"; 4) erecting a guardrail in the area where Mr. Bertotti lost control of his kart; and 5) permitting the kart race to continue when they knew that there was a one inch lip between the pavement and shoulder of the track in Turns 3 and 4 where Mr. Bertotti lost control of his kart. Even if the plaintiffs' allegations regarding the defendants' conduct and the evidence supporting them are considered in the light most favorable to the plaintiffs, the Court finds that there is no evidence of any aggravating factors establishing that the defendants were grossly negligent or acted with conscious or intentional disregard of plaintiff's safety.

■ In support of their position that defendants' conduct constituted gross negligence, plaintiffs rely essentially on the affidavit testimony of their expert witness, John C. Fitch. Defendants, however, have moved to strike Mr. Fitch's affidavit under Rule 56(e) because Mr. Fitch's deposition testimony reveals that he lacks any knowledge, skill, training, education or experience in kart racing that would assist the trier of fact in this case. While Mr. Fitch may have extensive experience in automobile racing and in designing "highway safety devices", Mr. Fitch

admittedly has no knowledge or expertise in kart racing or in the kart racing industry. His deposition reveals that he has never driven a race kart, never driven in a kart race, never set up crash barriers around a kart race track or worked in any capacity at a kart race, never been a member of a karting association, never worked for or consulted for a karting association, never seen an Enduro-kart race, never taught or attended any courses or seminars involving kart racing, and never written any articles or studies concerning karting. Moreover, when Mr. Fitch was asked in deposition whether the standards for crash barriers at go-kart races differ from the standard for crash barriers at other kinds of motor sports events, Mr. Fitch answered: "I don't know what the standards for go-kart racing barriers are." In view of Mr. Fitch's admitted lack of knowledge or experience in kart racing, the Court finds that Mr. Fitch's affidavit fails to meet the requirements of Rule 56(e) in that Mr. Fitch has not shown affirmatively that he is qualified by experience or background to offer opinions helpful to the triers of fact as to matters concerning kart racing. Thus, his affidavit will be stricken.

■ It is well settled in North Carolina that failure to follow industry custom is one of the key factors that must be taken into account to determine whether an owner or operator of a race track has breached a duty of care or acted negligently. The North Carolina Supreme Court has repeatedly held that the custom and practices of the industry determine whether the alleged conduct of a race track owner or operator amounts to negligence. *See Williams v. Strickland,* 251 N.C. 767, 773, 112 S.E.2d 533, 538 (1960) (ruling that the adequacy of the barriers and fences provided by the race track is principally determined by "custom of the business"); *Pardue v. Charlotte Motor Speedway, Inc.,* 273 N.C. 314, 318–319, 159 S.E.2d 857, 860 (1968) (holding that plaintiffs' allegations of negligence against a racetrack were insufficient in part because "there are no allegations of fact in the complaint showing that it is the general custom and practice among auto raceway proprietors to maintain guardrails capable of absorbing the shock of cars traveling ⁄ at speeds of 150 miles per hour"); *Lynn v. Wheeler,* 260 N.C. 658, 133 S.E.2d 514 (1963) (reversing a lower court's ruling in favor of the plaintiff on the grounds that the plaintiff failed to show that a crash barrier provided at the race track where plaintiff was injured did not conform to industry standards.) Plaintiffs have submitted no evidence in this case that the defendants' alleged conduct violated the customs, practices, or standards of the kart racing industry. Having failed to establish even ordinary negligence, plaintiffs cannot, as a matter of law, establish gross negligence.

IT IS THEREFORE ORDERED that defendants' joint motion for summary judgment is hereby GRANTED;

IT IS FURTHER ORDERED that defendants' joint motion to strike the affidavit of John C. Fitch is likewise hereby GRANTED.