Vincent F. **STRAWBRIDGE, Jr.,**
and Rebecca S. Strawbridge,
Plaintiffs,

v.

**SUGAR MOUNTAIN RESORT, INC.; B. Dale Stancil, Individually; the Sugar Mountain Irrevocable Trust; and the B. Dale Stancil Irrevocable Trust, Defendants.**

No. CIV. 1:02CV92.

United States District Court,
W.D. North Carolina,
Asheville Division.

May 10, 2004.

R. Hayes Hofler, Daniel B. Hill, Hayes, Hofler & Associates, P.A., Durham, NC, for plaintiffs.

Perry C. Henson, Jr., Amanda Mary Willis, Henson & Henson, LLP, Greensboro, NC, Wyatt S. Stevens, Roberts & Stevens, P.A., Robert E. Riddle, Asheville, NC, James R. Fox, Jennifer I. Oakes, Bell, Davis & Pitt, P.A., Winston–Salem, NC, for defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** is before the Court on Plaintiffs' timely filed objections to the Memorandum and Recommendation of United States Magistrate Judge Max O. Cogburn, Jr. Pursuant to standing orders of designation and 28 U.S.C. § 636, the undersigned referred the Defendants' motions for summary judgment to the Magistrate Judge for a recommendation as to disposition. Having conducted a *de novo* review to those portions of the recommendation to which specific objections were filed, the undersigned grants in part and denies in part the motion for summary judgment of Defendant Sugar Mountain Resort, Inc., ("Sugar Mountain") denies the motion for summary judgment of Defendants B. Dale Stancil, the Sugar Mountain Irrevocable Trust ("Sugar Mountain Trust"), and the B. Dale Stancil Irrevocable Trust ("Stancil Trust") (collectively, "the non-resort Defendants"), and denies the motions of all Defendants for leave to respond to Plaintiffs' objections to the Memorandum and Recommendation.

### I. PROCEDURAL HISTORY

Plaintiffs filed their complaint in this Court on April 22, 2002, and demanded relief for negligence, loss of consortium, and fraudulent transfers. They also alleged derivative liability on the part of non-resort Defendants and requested punitive damages. The fraudulent transfer claim was dismissed on April 11, 2003.

On December 1, 2003, Sugar Mountain filed its motion for summary judgment arguing that Plaintiffs had not submitted evidence to support a finding of negligence and that, even if they had, Plaintiffs had failed to demonstrate entitlement to punitive damages. In another motion for summary judgment filed the same date, the non-resort Defendants argued that Plaintiffs had failed to forecast evidence that would support a finding of derivative liability. The Magistrate Judge recommended summary judgment for the Defendants on all issues and dismissal of the action. Plaintiffs objected to the Magistrate Judge's recommendations, and the Defendants requested leave to reply to those objections.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and judgment for the moving party is warranted as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party, here the Plaintiffs. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). By reviewing substantive law, the Court may determine what matters constitute material facts. *Anderson, supra.* "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Id.* The Defendant as the moving party has the initial burden to show a lack of evidence to support the Plaintiffs' case. *Shaw, supra,* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If that showing is made, the burden then shifts to the Plaintiffs who must convince the Court that a triable issue does exist. *Id.* A "mere scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* Moreover, in considering the facts of the case for purposes of these motions, the Court will view the pleadings and material presented in the light most favorable to the Plaintiff, as the nonmoving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. LIABILITY OF SUGAR MOUNTAIN RESORT, INC.

### A. Statement of facts.

On January 22, 1998, Plaintiff Vincent Strawbridge fell while skiing at Sugar Mountain in Avery County, North Carolina. As a result of this fall, Plaintiff is confined to a wheelchair and has limited use of any part of his body below the neck. Exhibit 9, Deposition of Vincent Strawbridge, Jr., *included in* Appendix *attached to* Plaintiffs' Objections to Memorandum and Recommendation, filed March 1, 2004, at 50–100.

The back of Plaintiff's lift ticket stated that the user of the ticket agrees

To assume all risk of personal injury or loss or damage to property as a result of all the inherent risks of skiing whether said risks are known to user. The purchaser or user of this ticket agrees and understands that skiing can be hazardous. Variations in snow, ice, and terrain along with bare spots, bumps, moguls, stumps, forest growth, rocks and debris, and many other hazards or obstacles, including lift towers, snowgroomimg equipment, snowmobiles, and other skiers exist within this ski area. In using this ticket and skiing at the area, such dangers are recognized and accepted whether they are marked or unmarked. The skier realizes that falls and collisions do occur and therefore assumes all the risk of injuries or loss or damage to property and the burden of skiing under control at all times.

Exhibit 1, *contained in* Plaintiffs' Appendix.

Plaintiff rented ski equipment at Sugar Mountain and, in doing so, signed a form stating, among other things:

3. I agree to hold harmless and indemnify the ski shop and its owners, agents and employees for any loss or damage, including any that results from claims for personal injury or property damage related to the use of this equipment, except reasonable wear and tear.

.      .      .      .      .

5. I understand that there are inherent and other risks involved in the sport for which this equipment is to be used, snow skiing, that injures are a common and ordinary occurrence of the sport, and I freely assume those risks.

. . . . .

7. I hereby release the ski shop and its owners, agents and employees from any and all liability for damage and injury to myself or to any person or property resulting from negligence, installation, maintenance, the selection, adjustment and use of this equipment, accepting myself the full responsibility for any and all such damage or injury which my [sic] result.

Exhibit 8, *attached to* Defendant Sugar Mountain Resort, Inc.'s Motion for Summary Judgment, filed December 1, 2003 ("Sugar Mountain's Motion").[1]

Plaintiff claims that he fell when he skied across a bare spot on the Sugar Slalom slope. This bare spot was located approximately 15 feet from the right-hand side of the slope (looking down the slope), and was just beneath a "little hump or ridge" or a "ledge." Strawbridge Deposition, at 129, 137. Plaintiff did not slow down as he approached the ridge, but stated he was skiing under control. *Id.*, 138, 140. Plaintiff testified that he skied over the ridge, saw the bare spot, and attempted to ski around it. *Id.*, 130. He hit the bare spot and "fell face first." *Id.* Plaintiff described the bare spot as an exposed patch of dirt, not a rock, that was at least two feet long and one foot wide. *Id.*, 147–48, 164.

There is evidence other than Plaintiff's own testimony to support the inference that he did, in fact, fall on a bare spot.

Gunther Jochl, general manager and executive vice president of Sugar Mountain, admits that the area where Plaintiff claims to have fallen is difficult to cover with artificial snow because it is relatively far from the snow-making machines. Exhibit 6, Deposition of Gunther Jochl, *included in* Plaintiff's Appendix, at 29. However, Jochl also testified that he inspected the accident scene the day after Plaintiff fell and saw no area with thin enough snow coverage to cause a fall. *Id.*, at 42–43. Joe White, a ski patroller at Sugar Mountain, stated that there are some rocks near the spot where Plaintiff claims to have fallen. Exhibit 10, Deposition of Joe White, *included in* Plaintiffs' Appendix, at 7, 23. He further stated that the rocks would probably not have been marked as hazards because they are usually not concealed by snow and are on the "border" of the slope. *Id.*, at 23, 24, 30.

There is also evidence tending to show that there was no bare spot on the Sugar Slalom ski trail. Defendants offer evidence that Plaintiff actually had no idea what caused his fall in the time shortly after the accident. Defendants submit medical records stating that Plaintiff "is amnestic for event," that he "was uncertain as to the details" of his accident, and that he "has no memory for the event." Exhibit 4, *attached to* Sugar Mountain's Motion. An emergency room report from the Avery County Hospital notes that Plaintiff attributed his fall to "catching an edge" rather than hitting a bare spot. *Id.* Plaintiff claims that he has never been uncertain as to the details of the accident and that he did not recall telling anyone that he had been uncertain. Strawbridge Deposition, at 144.

1. Plaintiffs contend that Strawbridge only signed this document as a guardian for one of his children. Plaintiffs' Objections, at 33–34. For reasons explained below, this document does not waive Plaintiff's right to sue even if he signed it in his own capacity. Therefore, the Court will assume without deciding that he did sign this document in his own capacity.

Several members of the ski patrol who assisted Plaintiff after his fall filed reports indicating that there were no bare spots near the accident. Todd Bolyea's report stated that there was a "good base and no bare spots near the accident site." Exhibit 1, Supplemental Patroller's Form Accident Investigation, *included in* Plaintiffs' Appendix. In his deposition, Bolyea testified he "did not see anything that would make [him] think that there was a hazard existing. . . . It was a safe scene." Exhibit 3, Deposition of Todd Bolyea, *included in* Plaintiffs' Appendix, at 30. Robert Boyer's supplemental patroller's form stated that there was "plenty snow, no ground showing." Deposition Exhibit 6 *attached to* Deposition of Robert Boyer, *included as* Exhibit 4 of Plaintiffs' Appendix. Boyer testified that there was "no ground showing" and that there were no "bare spots or rocks or anything else." Boyer Deposition, at 26, 28. Finally, Richard Casey's supplemental patroller's report stated that the "snow was in good condition. There was good coverage in the area and I saw *no bare spots on the slope.*" Deposition Exhibit 7 *attached to* Deposition of Richard Casey, *included as* Exhibit 5 of Plaintiffs' Appendix. In the section entitled, "How did occurrence happen in skier's words?," of the winter occurrence report, Denis Simko wrote, " 'hit some dirt went head first and hit back on head and neck'." Exhibit 1, *included in* Plaintiffs' Appendix.

Plaintiffs submit pictures of the accident scene to prove that there was, in fact, a bare spot. Exhibit 1, Plaintiffs' Appendix. Handwritten on all five pictures is the date "1/24" and the time "10:15a." It is undisputed that the date on the pictures is incorrect. Defendants' witnesses state that the pictures were actually taken on January 23, the morning after the accident. White Deposition, at 28; Jochl Deposition, at 28. Plaintiffs claim that the lighting and the weather conditions shown in the pictures imply that the pictures

were taken on January 22, immediately following the accident. Plaintiffs' Objections, at 22–24.

The photograph on page 279 of Plaintiffs' Appendix Exhibit 1 seems to show that on the left-hand side of the slope (looking up the slope) there is an area just beneath a ridge with little or no snow cover. Jochl claims that the picture misrepresents the contour of the slope and that there is not, in fact, a ridge above the area that appears to be a bare spot. Jochl Deposition, at 25, 108. Furthermore, Jochl claims that there had been a night of heavy rain between the time of the accident and the time of the picture and that the rain had melted roughly two inches of snow. *Id.*, at 104. White's testimony is consistent with Jochl's in that White emphasized that snow had melted on the mountain between the time of the accident and the time the pictures were taken. *See* White Deposition, at 15. White's testimony conflicts with Jochl's, however, in that White states that there is a "knoll" or a "crest" in the area where Plaintiff claims to have fallen. *Id.*, 24.

Sugar Mountain's winter occurrence reports indicate that, in the 12 days leading up to Plaintiff's accident, there were seven accidents that Sugar Mountain skiers had attributed to bare spots. Exhibit 1, Plaintiffs' Appendix. Sugar Mountain's records and its responses to interrogatories show many slopes had been closed during January 1998 for lack of snow and that Sugar Slalom had been closed due to lack of snow from January 8 until January 21. Exhibits 1, 1A, Plaintiffs' Appendix. Jochl testified that Sugar Mountain tries to cover bare spots with snow but does not mark bare spots or areas with thin snow coverage. Jochl Deposition, at 79–81. ("No, we don't mark bare spots.") Jochl testified that the resort does mark what they consider to be "hidden hazards" such as rocks. *Id.*, at 80.

More generally, with regard to Sugar Mountain's care in monitoring the slopes, Jochl testified that he inspects each slope around 5:30 or 6:00 every morning to determine which slopes may be opened. *Id.*, at 76–78. Also, before the patrons begin skiing, members of the ski patrol ski down and perform an inspection of each slope. Boylea Deposition, at 14–15. Over the course of the day, ski patrollers are responsible for skiing and monitoring all of the slopes on the mountain. *Id.*, at 15–16.

## B. Discussion.

### 1. Assumption of risk and waiver

■ Before determining whether there is evidence to support a finding of negligence, the Court will consider whether the Plaintiff waived his right to sue Sugar Mountain for negligence and whether he assumed the risk of falling on a bare spot. Under North Carolina law, "a person may effectively bargain against liability for harm caused by his ordinary negligence in the performance of a legal duty ...." *Hall v. Sinclair Refining Co.*, 242 N.C. 707, 709, 89 S.E.2d 396, 397 (1955). North Carolina courts strictly construe the terms of exculpatory agreements against the parties seeking to enforce them. *Id.* However, the courts "will enforce an exculpatory clause unless it is violative of a statute, gained through inequality of bargaining power, or contrary to a substantial public interest." *Waggoner v. Nags Head Water Sports*, 141 F.3d 1162 (table), 1998 WL 163811, *7 (4th Cir.1998).

■ Defendants rely on the ski equipment rental agreement and the statement on the back of the lift ticket to show that Plaintiff waived his right to bring this action. On the rental form, Plaintiff agreed to "hold harmless" the ski shop and its owner, Sugar Mountain, for personal injury "related to the use of this equipment." Exhibit 8, Sugar Mountain's Motion. He also agreed to release the ski shop and

Sugar Mountain from "all liability for damage and injury to [himself] ... resulting from negligence, installation, maintenance, the selection, adjustment and use of this equipment." *Id.* Giving broad meaning to the phrases "related to the use of this equipment" and "resulting from ... use of this equipment," one could interpret the agreement to bar all suits arising out of injuries suffered while using the equipment. But one could just as reasonably interpret the statements as barring only suits that arise out of injuries *caused* by the equipment. Since the Court is to construe the agreement against the party seeking to enforce it, the Court accepts the latter meaning. Plaintiff does not claim that the equipment caused his injuries. Therefore, the agreement that he signed while renting equipment does not bar this action.

■ However, the statement on the back of the lift ticket clearly encompasses injuries of the type Plaintiff suffered. The writing on the lift ticket states that the user agrees to "assume all risk of personal injury as a result of all the inherent risks of skiing." Exhibit 1, Plaintiffs' Appendix. The writing states that "variations in snow, ice, and terrain along with bare spots, bumps, moguls ... exist within this ski area" and that the user of the ticket recognizes and accepts those dangers "whether they are marked or unmarked." *Id.* Significantly, Plaintiff claims that his injury was caused by a bump just above an unmarked bare spot—hazards clearly described on the lift ticket. Finally, the writing states that the "skier realizes that falls ... do occur and therefore assumes all the risk of injuries." *Id.* One may argue that the writing on the lift ticket never specifically states that a skier will not sue Sugar Mountain; it merely states that skiers are aware of and assume the risk of injuries. Although the Court is to

construe the agreement against Sugar Mountain, such an interpretation would go too far. In fact, the Fourth Circuit, applying maritime and North Carolina law, has rejected a similarly formalistic interpretation of an exculpatory clause. *See Waggoner, supra,* at **3–5 (A clause barring "all claims" included claims for negligence even though it did not mention negligence specifically.) Therefore, the statement on Plaintiff's lift ticket, by its own terms, does bar him from suing Sugar Mountain for the injury he suffered.

The issue, then, becomes whether North Carolina law permits enforcement of the exculpatory terms on Plaintiff's lift ticket. Under North Carolina law, an exculpatory clause may be enforced unless "it is violative of a statute, gained through inequality of bargaining power, or contrary to a substantial public interest." *Id.,* at *7. To enforce the exculpatory terms on the lift ticket would violate § 99C of the North Carolina General Statutes, the section entitled "Actions Relating to Skier Safety and Skiing Accidents." That statute imposes on ski area operators the duty "[n]ot to engage willfully or negligently in any type of conduct that contributes to or causes injury to another person or his properties." N.C. Gen.Stat. § 99C–2 (c)(7). Plaintiffs' case is built on the claim that Sugar Mountain acted negligently and injured them by allowing a bare spot to exist and failing to mark it. If such conduct constitutes negligence, then allowing Sugar Mountain to contract its way out of liability would undercut the statute. Therefore, the exculpatory language on the lift ticket is unenforceable, and this action is not barred.

█ Even if the exculpatory language did not violate a statute, it would still be void because enforcing the language would run contrary to a substantial public interest. The public interest exception to the general rule that exculpatory clauses are enforceable finds its basis in the North Carolina Supreme Court's statement that "a party cannot protect himself by contract[ing] against liability for negligence in the performance of a duty of public service, or where a public duty is owed, or public interest is involved, or where public interest requires the performance of a private duty." *Hall, supra,* at 710, 89 S.E.2d at 398 (quotation omitted). One district court, attempting to interpret this statement from *Hall,* noted that other jurisdictions usually hold exculpatory clauses to be unenforceable "where the party relying on the exculpatory clause (a) is significantly regulated by public authority, (b) holds himself out to the public as willing to perform the sort of services subject to such regulation, [and] (c) purports to be capable of performing those services in conformity with the standard of care established in the community . . . ." *Tatham v. Hoke,* 469 F.Supp. 914, 918 (W.D.N.C. 1979). Another district court has stated that the public interest exception "applies only to entities or industries that are heavily regulated." *Bertotti v. Charlotte Motor Speedway, Inc.,* 893 F.Supp. 565, 569 (W.D.N.C.1995).

As for specific applications of the rule, the North Carolina Court of Appeals has held that the cosmetology industry is one sufficiently tied to the public interest to prevent cosmetologists from escaping liability for their negligence. *Alston v. Monk,* 92 N.C.App. 59, 63–64, 373 S.E.2d 463, 466–67 (1988). Similarly, a federal court held that the abortion industry serves the public interest and that exculpatory clauses are improper in that industry. *See Tatham, supra,* at 917–19. But federal courts have also held that the industries of renting jet skis and go-karts do not serve the public interest in a way that would make exculpatory clauses unenforceable. *Bertotti, supra,* at 568–68; *Waggoner, supra,* at **7–8.

Although this case presents a very close question, the Court finds that the ski industry is sufficiently regulated and tied to the public interest to make exculpatory clauses improper. Obviously, since North Carolina law governs this case, statements from the North Carolina courts are of paramount significance. In *Alston,* the North Carolina Court of Appeals held that "the practice of cosmetology ... involves the use of hazardous chemicals which may adversely affect the health of any customer" and that the "General Assembly [therefore] extensively regulates the practice of cosmetology." *Alston, supra.* Similarly, skiing presents numerous risks to participants which has led the General Assembly to enact legislation regulating the operation of ski slopes. Admittedly, the legislation regulating cosmetology is more extensive than that regulating skiing, but this Court will not draw arbitrary lines regarding how much legislation constitutes "heavy regulation" under North Carolina laws. This holding is consistent with *Bertotti* and *Waggoner* because those opinions did not mention *any* legislation specifically aimed at the go-kart or the jet skiing industries.[2] Therefore, for ski area operators to contract out of liability for negligence would run counter to the public interest as defined by North Carolina courts, and the exculpatory language on Plaintiff's ticket is, for that reason as well, unenforceable.

## 2. Negligence.

■ To prevail on a negligence claim in North Carolina, a plaintiff must establish that 1) the defendant owed the plaintiff a duty of care, 2) the defendant breached that duty, 3) the plaintiff suffered damages, and 4) the damages were proximately caused by the defendant's breach. *See Clark v. Perry,* 114 N.C.App. 297, 304–05, 442 S.E.2d 57, 61 (1994). The parties dispute the standard of care that Sugar Mountain owed Plaintiff. Under North Carolina common law, property owners owe to invitees like Plaintiff "a duty to exercise ordinary care to keep [their premises] in a reasonably safe condition and to warn [lawful visitors] of hidden dangers or unsafe conditions of which [they] had knowledge, express or implied." *Norwood v. Sherwin–Williams Co.,* 303 N.C. 462, 467, 279 S.E.2d 559, 562 (1981). Under this principle of common law, a plaintiff may recover by showing "that the defendant either (1) negligently created the condition causing the injury, or (2) negligently failed to correct the condition after actual or constructive notice of its existence." *Roumillat v. Simplistic Enter., Inc.,* 331 N.C. 57, 64, 414 S.E.2d 339, 342–43 (1992).

Defendants contend that North Carolina altered the common law when it enacted N.C. Gen.Stat. § 99C–2 (c)(6). That statute provides that a ski area operator must "mark clearly any hidden rock, hidden stump, or any other hidden hazard known by the ski area operator to exist." Defendants argue that the statute imposes on ski area operators only an obligation to mark hidden hazards that they actually know to exist and does not contemplate constructive notice. Therefore, Defendants contend that Plaintiff must show that Sugar Mountain knew of the alleged bare spot. Constructive notice, they claim, would be insufficient. Sugar Mountain's Motion, at 8–9.

■ Though this Court finds no case where North Carolina courts have specifically addressed the issue, they have applied the rules of common law premises

---

**2.** The *Waggoner* opinion partially relied on the fact that the North Carolina Boating Safety Act does "not address the duties owed by one who rents such craft for recreational use." *Waggoner, supra,* at *7.

liability subsequent to the enactment of § 99C–2 (c)(6). *Freeman v. Sugar Mountain Resort, Inc.,* 134 N.C.App. 73, 76, 516 S.E.2d 616, 618, *rev'd on other grounds,* 351 N.C. 184, 522 S.E.2d 582 (1999). Furthermore, this Court has applied North Carolina common law rules for premises liability in a case with facts very similar to this one. *Poole v. Sugar Mountain Resort, Inc.,* 1999 WL 33321102, *2 (W.D.N.C.1999). Finally, even if § 99C–2(c)(6) did alter common law principles regarding notice of hidden hazards, § 99C–2(c)(7) makes it unlawful for ski area operators to act "negligently." This would indicate that any action that constituted negligence at common law violates § 99C–2(c)(7) even if it does not violate § 99C–2(c)(6). Therefore, the Court finds that § 99C did not modify the common law regarding premises liability, and Plaintiff may prevail on his common law claim by showing that Sugar Mountain negligently failed to correct a dangerous condition after having constructive notice of its existence.

■ Since common law principles of negligence and premises liability are applicable to this case, the Court will now determine whether Plaintiffs have forecast evidence that could support a finding in their favor based on those principles. To answer that question, the Court must look no further than its holding in *Poole.* In that case, this Court determined that a plaintiff could survive summary judgment by offering evidence of a bare spot on a slope, evidence that defendants knew of conditions that may cause bare spots, and evidence that the bare spot was in some way concealed. *Poole, supra,* at *1. Here, though the issue is contested, there is evidence of a bare spot. Furthermore, Sugar Mountain clearly knew that there were likely bare spots on the mountain because of the reports of injured skiers in the days preceding the Plaintiff's injury; because many slopes, including Sugar Slalom, had been closed in the previous weeks for lack of snow; and because the weather forecast for the day in question called for temperatures in the 40's and rain. Exhibit 1A, Defendants' Answers to Plaintiffs' First Set of Interrogatories, *included in* Plaintiffs' Appendix, at Interrogatory 32; Sugar Mountain's Motion, at 19. Finally, Plaintiff's testimony and that of Joe White provide evidence of a ridge or crest that may have concealed the bare spot. White Deposition, at 24; Strawbridge Deposition, at 129, 137.[3]

One may also interpret *Poole* as requiring the Defendants to know "that an appropriate standard of care would require that the bare spot be covered with snow" and that "[w]arning signs should be posted to identify bare spot hazards." *Poole, supra,* at *1. The Court need not state whether those facts are essential to *Poole's* holding because the Court has previously determined that Sugar Mountain knew to cover bare spots and to post warning signs. *Id.* There is no evidence that they attempted to cover this bare spot or posted any warning signs on the slope. Therefore, based on its previous holding in *Poole,* the Court finds that Plaintiffs have forecast evidence that allows them to withstand summary judgment on the issue of negligence.

### 3. Punitive damages.

The North Carolina legislature has decided that a claimant may only recover punitive damages if he can prove entitlement to compensatory damages and one of the following aggravating factors: 1)

---

**3.** In determining that Plaintiffs have forecast evidence to support the inference that a bare spot existed and a ridge concealed it, the Court has not considered any photographs. Whether and to what extent the photographs are admissible is a question for another day.

fraud, 2) malice, or 3) willful or wanton conduct. N.C. Gen.Stat. § 1D–15(a). "The claimant must prove the existence of an aggravating factor by clear and convincing evidence." N.C. Gen.Stat. § 1D–15(b). In the case *sub judice* the issue is whether the Plaintiffs have forecast evidence that may clearly and convincingly prove willful or wanton conduct on the part of the Defendants.

Under North Carolina law, " 'willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen.Stat. § 1D–5(7). The North Carolina Court of Appeals has explained this definition by stating that " '[w]ilful and wanton' negligence is conduct which shows either a deliberate intention to harm, or an utter indifference to, or conscious disregard for, the rights or safety of others. 'Carelessness and recklessness,' though more than ordinary negligence, is less than wilfulness or wantonness." *Meeks v. Crawford,* 160 N.C.App. 708, —— S.E.2d —— (table), 2003 WL 22387898, at *6 (2003).

Plaintiffs argue that Defendants engaged in willful and wanton conduct by not marking bare spots on the mountain even after skiers had reported injuries caused by bare spots, by misrepresenting the amount of snow on the mountain, and by deliberately misleading skiers as to their legal rights under North Carolina law. Plaintiffs' Objections, at 40–43. Though the Court has determined that the statement on the back of Sugar Mountain's lift tickets did purport to limit the resort's liability in a way not permitted under North Carolina law, there is absolutely no evidence to support the inference that Defendants deliberately misstated the law in

order to prevent patrons from bringing law suits. Furthermore, the Court finds that the other alleged conduct, failing to mark bare spots after hearing reports that they were causing injuries and exaggerating the amount of snow on the mountain, does not rise to the level of willfulness and wantonness.

**4. Conclusion.**

Since the exculpatory clauses in question were ineffective, and since this Court's precedent indicates that there is a triable issue of negligence, Sugar Mountain's motion for summary judgment on the negligence issue will be denied. Sugar Mountain's motion for summary judgment on the issue of punitive damages, however, will be granted since Plaintiffs have not forecast evidence of willfulness or wantonness.

## IV. DERIVATIVE LIABILITY

**A. Statement of facts.**

Defendant B. Dale Stancil and business associate J. Ray Costin purchased the land, equipment, and ski business known as "Sugar Mountain" in a bankruptcy proceeding in 1978. Exhibit 17, Deposition of B. Dale Stancil, *included in* Plaintiffs' Appendix, at 17. Sugar Mountain Resort, Inc., was subsequently created to conduct the ski operations and hold non-real estate assets. Stancil, Costin, and their wives leased the land on which the ski business was operated to the resort. Lease Agreement, *included in* Appendix to Non–Resort Defendants' Motion for Summary Judgment ("Defendants' Appendix"), at 192–213.

In 1979, Defendant Sugar Mountain Trust was created, and Stancil and Costin conveyed the real estate to the Sugar Mountain Trust, which continued to lease the land to the resort for the ski business.

Sugar Mountain Irrevocable Trust, *included in* Defendants' Appendix, at 214–28. According to Stancil, he and Costin decided to transfer the real property into the Sugar Mountain Trust for estate planning purposes. Stancil Deposition, *supra,* at 90; *see also* Deposition of Loyd Russell Daniel, Jr., *included in* Defendants' Appendix, at 105. The beneficiaries of the Sugar Mountain Trust were the Defendant Stancil Trust, which was established for Stancil's children, and a third irrevocable trust established for Costin's children. Stancil Deposition, *supra.* Stancil is not the trustee for either the Sugar Mountain Trust or the Stancil Trust, and he testified that he has no access to the corpus of either trust. *Id.,* at 92; Defendants' Appendix, at 214, 222.

In 1986, Sugar Mountain redeemed Costin's 50 percent interest in the corporation, making Stancil the sole owner of Sugar Mountain. Defendants' Appendix, at 241–48. In 2001, Stancil sold a 33 percent interest in the resort to Jochl for $1 million. Stancil Deposition, *supra,* at 28. Between the time Stancil became the sole owner and the time he sold a minority interest to Jochl, Stancil was the sole member of the Board of Directors. *Id.,* at 22.

During the time that Stancil was the sole owner and director of Sugar Mountain, he did not set a date and time for board meetings. *Id.,* at 114–15. Instead, each year, he would discuss the status of the resort with Jochl and other associates, and then, in compliance with N.C. Gen. Stat. § 55-7-04, he would file a form entitled "Consent of Director and Stockholder of Sugar Mountain Resort, Inc. to Action Without Meeting." *Id.,* at 114–15; *see also* Exhibit 20, *included in* Plaintiffs' Appendix. On these forms, Stancil would appoint Sugar Mountain's officers, state their salaries, and summarize Sugar Moun-

tain's operations for the year. Exhibit 20, *supra.*

It appears that Stancil has been Sugar Mountain's President and Jochl its Vice President since 1986. *Id.* During that time period, there have been numerous other officers who have drawn modest salaries, but it is not clear what, if any, tasks those officers have performed. *Id.* The only indication that the Court finds of what those officers may have done is Stancil's vague statement that his brother, Wayne Stancil, "performs some services as an officer." Stancil Deposition, at 101.

As to other corporate formalities, Defendant Stancil testified that Sugar Mountain has maintained its corporate status throughout its existence, has consistently paid its corporate franchise taxes, has met all of its financial obligations, and owns approximately $1 to $2 million dollars in assets. *Id.,* at 109–11.

Stancil has frequently taken advances out of Sugar Mountain's income. In fact, corporate records show that, in some years, Stancil took several million dollars' worth of advances. Exhibit 20, *supra, included in* Plaintiffs' Appendix. Stancil usually notified Jochl that he was going to take an advance, but he had the authority to take advances without anyone's approval. Exhibit 30, Second Deposition of Gunther Jochl, *included in* Plaintiffs' Appendix, at 31, 50–51. However, corporate records also show that Stancil frequently made payments to Sugar Mountain and that Sugar Mountain charged Stancil interest on the money that it advanced to him. *Id;* Stancil Deposition, at 36. The interest rates that Sugar Mountain charged "were the interest rates established by the federal government as interest rates for non-drawn-up notes—in other words, advances." Daniel Deposition, *supra,* at 119. Stancil testified that he has never taken an advance that has hin-

dered Sugar Mountain's ability to pay its obligations. Stancil Deposition, at 111.

Stancil also received dividends from Sugar Mountain as the corporation's sole shareholder. Exhibit 20, *included in* Plaintiffs' Appendix. He stated that "all [net] income from Sugar ... is dividend to me." Stancil Deposition, *supra*, at 66. Loyd Daniel, Sugar Mountain's principle accountant, described the relationship between Stancil's dividends and his advances as:

> So the practice, because of the cash position of Sugar Mountain at the end of March, was that Mr. Stancil would borrow out during the calendar year, and then at the end of the year, in effect we would declare a dividend and remove that loan from the books.

Daniel Deposition, *supra*, at 113. Daniel also pointed out that Stancil had not, and was not legally permitted, to declare dividends in excess of Sugar Mountain's accumulated earnings since 1986, when Stancil elected to operate Sugar Mountain as a subchapter S corporation. *Id.*, 116. Stancil described the relationship between the advances and dividends by saying that he took "sporadic advances during the course of the year that are then settled up against whatever dividend." Stancil Deposition, at 72.

It is uncontradicted that Jochl has always made some decisions regarding Sugar Mountain's day-to-day operations. Stancil describes his own role in Sugar Mountain as "owner/investor." *Id.*, at 21. He claims that he and Jochl discuss plans for Sugar Mountain such as expanding the resort, adding trails, and buying equipment, and Jochl implements those plans. *Id.*, at 21–22. As for personnel decisions, Stancil explained that he and Jochl would discuss them but that "ultimately it is [Jochl's] decision on what he wants to do up there and who he wants to do it with." *Id.*, at 22.

Jochl's testimony is, for the most part, consistent with Stancil's in its description of Stancil's role in the operation of Sugar Mountain. Jochl testified that Stancil "does not interfere in the day-to-day operations" of Sugar Mountain. Second Jochl Deposition, at 50. Jochl did testify, however, that Stancil had ultimate control over the financial aspects of Sugar Mountain. *Id.*, at 21.

One decision of particular relevance to this case is the decision whether and to what extent Sugar Mountain would insure itself against liability. Stancil testified that he is responsible for deciding what Sugar Mountain's insurance policy limits should be. Stancil Deposition, at 97. He stated that Sugar Mountain had, at one time, carried a policy with a $3 million limit and had reduced the limit to $1 million. *Id.*, at 98. His stated reason for reducing the policy limit is that $1 million was "more than adequate to cover anything in twenty-seven years." *Id.*, at 97–98. Jochl testified that Sugar Mountain had never had a personal injury judgment entered against it and that Sugar Mountain had never settled a claim for more than $500,000. Second Jochl Depo., at 38–39.

## B. Discussion

■ In North Carolina, Courts apply the "instrumentality rule," disregarding the corporate entity and imposing liability upon a dominant shareholder where the plaintiff can prove the following three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control

must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*B–W Acceptance Corp. v. Spencer,* 268 N.C. 1, 9, 149 S.E.2d 570, 576 (1966) (internal quotations and citations omitted).

■ But the North Carolina Supreme Court has also cautioned that

> It should be remembered that the theory of liability under the instrumentality rule is an equitable doctrine. Its purpose is to place the burden of the loss upon the party who should be responsible. Focus is upon reality, not form, upon the operation of the corporation, and upon the defendant's relationship to that operation. It is not the presence or absence of any particular factor that is determinative. Rather, it is a combination of factors which, when taken together with an element of injustice or abuse of corporate privilege, suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the dominant corporation.

*Glenn v. Wagner,* 313 N.C. 450, 458, 329 S.E.2d 326, 331 (1985). Furthermore, the element of injustice or abuse of corporate privilege "need not include fraud. It is sufficient that the actions show an ulterior purpose to benefit the person in control in a way not possible or legal without misuse of the controlled corporation." *Dassault Falcon Jet Corp. v. Oberflex, Inc.,* 909 F.Supp. 345, 350 (M.D.N.C.1995) (internal citations omitted).

North Carolina courts have listed countless factors to consider in deciding whether to disregard the corporate form. These factors include "inadequate capitalization, non-compliance with corporate formalities, complete domination and control of the corporation so that it has no independent identity, excessive fragmentation of a single enterprise into separate corporations, ... non-payment of dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, non-functioning of other officers or directors, [and] absence of corporate records." *Glenn, supra,* at 455–58, 329 S.E.2d at 330–32.

■ Since this Court is to consider the "reality, not form," *Glenn, supra,* of the relationship between Stancil and Sugar Mountain, the Court determines that the evidence would support a finding that Sugar Mountain was Stancil's alter ego. At all relevant times, Stancil was the sole shareholder, sole director, and president of Sugar Mountain. With such centralized corporate governance, the jury could quite reasonably disbelieve testimony that Jochl, or anyone other than Stancil, had meaningful authority at Sugar Mountain. Even if Stancil did delegate some decisions regarding the day-to-day operations of Sugar Mountain to Jochl, the jury could determine that Stancil had the authority to overturn Jochl's decisions and to relieve Jochl of his decision-making authority. Since one could conclude that all decisions at Sugar Mountain were subject to Stancil's approval, the Court cannot find that Stancil did not exercise complete control with respect to the transaction attacked. Other factors that could lead a jury to believe that Sugar Mountain was Stancil's alter ego include 1) the fact that the real estate used by the corporation was put into the name of the Sugar Mountain Trust, 2) the apparent non-functioning of most corporate officers, and 3) the fact that Stancil seemingly took cash out of

Sugar Mountain almost as quickly as it was earned.

By denying the non-resort Defendants' motion for summary judgment, the Court is not implying that a jury should pierce the corporate veil. The Court merely holds that enough evidence has been forecast by Plaintiffs to support a jury's decision to do so. As such, summary judgment on this issue would be inappropriate.

## V. MOTIONS FOR LEAVE TO RESPOND TO OBJECTIONS

The arguments contained in the Defendants' proposed responses to Plaintiffs' objections to the Memorandum and Recommendation would not affect the Court's decision on any issue. Therefore, the Defendants' motions for leave to respond are denied as moot.

## VI. ORDER

IT IS, THEREFORE, ORDERED that the motion for summary judgment of Sugar Mountain Resort, Inc., is hereby **DENIED** as to the issue of negligence and is hereby **GRANTED** as to the issue of punitive damages.

IT IS FURTHER ORDERED that the motion for summary judgment of the non-resort Defendants is hereby **DENIED**.

IT IS FURTHER ORDERED that the Defendants' motions for leave to respond to the objections to the Memorandum and Recommendation are hereby **DENIED AS MOOT**.

IT IS FURTHER ORDERED that, considering the date of the incident herein and subsequent proceedings in this case, the Clerk shall calendar this case for trial during the July 2004 mixed trial term beginning July 12, 2004.