**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 19 2001**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

WALLACE R. NOEL,

       Plaintiff-Appellant,

v.

ROBERT MARTIN; MARTIN, PRINGLE, OLIVER, WALLACE & SWARTZ, LLP, a Kansas Limited Liability Partnership engaged in the practice of law,

       Defendants-Appellees.

No. 00-1532
(D.C. No. 97-D-2580)
(D. Colo.)

---

**ORDER AND JUDGMENT** *

---

Before **EBEL** , **KELLY** , and **LUCERO** , Circuit Judges.

In this legal malpractice action, plaintiff Wallace R. Noel appeals the

district court's orders prohibiting the late endorsement of proposed expert Morris,

---

* The case is unanimously ordered submitted without oral argument pursuant to Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The Court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

disqualifying proposed expert Oyler, granting summary judgment in favor of defendants, and denying plaintiff's motion to alter or amend. We affirm.

## I

In the early 1970s, plaintiff acquired exclusive Pizza Hut franchise rights for several territories in Texas. In 1974, plaintiff was approached by Torres, who also owned a number of Pizza Hut franchises, about forming a management corporation with other franchisees. Torres proposed that the individual franchisees would transfer their interests to the corporation in return for shares. In 1975, Pizza Management, Inc. (PMI) was formed, and plaintiff received approximately ten percent of the outstanding shares. In 1976, PMI and Torres negotiated a special agreement with Pizza Hut which would allow them to publicly offer shares of PMI, and on this basis, plaintiff transferred his franchise rights to PMI. The agreement allowing public sale of PMI shares was reconfirmed in 1981.

In 1985 and 1986, PMI negotiated several franchise trades and purchases with Pizza Hut. PMI also entered into certain agreements with individuals allowing them to purchase PMI stock at reduced prices as deferred compensation. Later in 1986, PMI developed plans for a public offering. PMI was prevented from offering its shares to the public, however, by Pizza Hut and its parent

company, PepsiCo, Inc. (PepsiCo), based on the terms of the 1985 and 1986 franchise agreements and the deferred compensation agreements.

In May 1988, plaintiff and his sons, as shareholders of PMI, brought a civil action against PepsiCo and Pizza Hut in the Kansas state court. PMI and Torres were later added as party defendants. Plaintiff alleged that Pizza Hut and PepsiCo tortiously interfered with his prospective business advantage by refusing to allow the public stock offering; that Pizza Hut was estopped from preventing the public offering; that the dealings between defendants breached obligations owed to plaintiff as a third-party beneficiary under the 1976 and 1981 agreements; that PMI and Torres committed fraud during the initial issuance and distribution of PMI stock; and that PMI's and Torres' acts of entering into the 1985 and 1986 transactions, and issuing PMI shares as deferred compensation, breached their fiduciary duties to plaintiff. Plaintiff was represented in the Kansas litigation by the current defendants, Robert Martin, and Martin's law firm of Martin, Pringle, Oliver, Wallace & Swartz, LLP.

In 1990, petitioner entered into a settlement agreement with PepsiCo, under which PepsiCo would purchase plaintiff's PMI stock at $8.25 per share, for a total of $3,250,071, in return for plaintiff's release of his claims against PepsiCo and Pizza Hut. Plaintiff entered into this agreement to obtain cash to avoid a mortgage foreclosure on a piece of Colorado real estate. In 1992, PepsiCo and

Pizza Hut purchased all of PMI's Pizza Hut franchises and restaurants. PMI's remaining shareholders realized more than $21 per share from this sale.

Before trial of plaintiff's action against PMI and Torres, the state court granted summary judgment in favor of PMI and Torres on plaintiff's third-party beneficiary claim, ruling that because the 1976 and 1981 agreements did not obligate PMI and Torres to make a public offering, their failure to do so was not a breach of the agreements. Plaintiff's remaining claims were tried to a jury from November 27, 1992 to January 18, 1993. Much of the trial centered on the amount of damages, if any, incurred by plaintiff.

To support his damage claim, plaintiff presented expert evidence that he lost $7,100,000 in proceeds from the inability to sell his shares on the open market, that he lost an additional $4,700,000 in earnings appreciation because he was unable to reinvest those proceeds, and that after subtracting the amount he received from PepsiCo, he suffered a loss of $8,000,000. The expert calculated plaintiff's earnings appreciation loss by using the rate of return realized by the Standard & Poor's 500 index, explaining that this index was a general indicator of stock market performance. PMI and Torres challenged the expert's assumptions by presenting much lower estimates of the value of the PMI stock had it been offered to the public, by showing that the stock market fell dramatically within a year of the proposed public offering, and by showing that plaintiff's investment

history was different from that of a typical investor in the stock market. As part of its evidence, PMI and Torres introduced certain financial records regarding plaintiff's prior investments, earnings, and tax liabilities.

The jury returned a verdict finding that although PMI and Torres breached their fiduciary duties to plaintiff, he incurred no damages as a result. The jury found both that plaintiff did not suffer damages from the inability to sell his stock to the public, and that he was not damaged by the inability to invest his earnings. The jury also found that PMI and Torres did not commit fraud in the issuance and distribution of PMI stock.

Plaintiff appealed, and the case was transferred to the Kansas Supreme Court. The court's opinion affirming the judgment contained the following analyses. In response to plaintiff's argument that the trial court erred in admitting irrelevant and prejudicial financial records, the Kansas Supreme Court stated:

> [T]he defendants challenged the facts and assumptions underlying Noel's claim for $4.7 million in lost "earnings appreciation." As an estimated rate of return on Noel's $7.1 million in claimed lost proceeds, [Noel's expert] used the Standard & Poor's 500 index (S & P 500), explaining that the S & P 500 was a general indicator of stock market performance. [The expert] therefore assumed that Noel would have invested all of his $7.1 million and fared at least as well as the S & P 500 from 1987 to the present. According to [the expert], the S & P 500 recorded increases of 16.6 percent in 1988 and 31.7 percent in 1989 . . . .
>
> The defendants countered by introducing evidence of Noel's personal track record on investments, which was not as successful as the S & P 500. The track record included his pre-1981 financial

statements as well as financial information from 1987 to the present. For example, Noel lost $357,000 investing in a T.J. Cinnamons franchise between 1988 and 1990. The defense also suggested that Noel lost $3 million in oil-based securities when oil prices dropped. Noel's financial statements dating from 1972 provided a history of Noel's personal investment tendencies. These financial statements, the defendants contend, "showed a history of investments in race horses, real estate, vacation homes, [and] oil and gas ventures, not in stocks represented by the Standard & Poor's 500." Defense counsel urged the jury to "follow [Noel's] track record and investments" rather than the S & P 500 in considering any "earnings appreciation" damages.

An examination of Noel's financial statements supports the defendants' assertion that he invested in many things other than S & P 500 stocks, and had mixed results. We conclude that the district court did not abuse its discretion in finding Noel's pre-1981 financial statements relevant and in admitting his financial history.

Noel v. Pizza Mgmt., Inc., 899 P.2d 1013, 1020 (Kan. 1995).

With regard to plaintiff's argument that the district court erred in granting summary judgment on the third-party beneficiary claim, the court stated:

The problem with Noel's contention, as the defendants point out, is that his first and second claims for relief do not allege a breach of any obligation contained in the 1976 or 1981 agreements. . . . Nowhere in the agreements at issue between Pizza Hut and PMI . . . does PMI assume any obligation to its shareholders to go public. . . .

Noel's response in his reply brief undermines his third-party beneficiary theory. He contends:

"The fact that the 1976 and 1981 Amendments express no obligation on the part of defendants to carry out a public offering cannot provide a defense since the obligation of defendants to conduct a public offering arises from the agreements, plans and undertakings of

-6-

> Torres to the original shareholders entered into when PMI was formed and the franchise rights were transferred. It was unnecessary to include in the 1976 and 1981 Amendments any obligation on the part of defendants to conduct a public offering because that obligation had already been expressed and agreed upon between Torres and the original shareholders. It existed independently of the written agreements with Pizza Hut."
>
> Noel's PMI-formation argument reveals that to the extent Noel asserts the existence and breach of any contractual rights owing to him concerning PMI's failed public offering, such rights arose "independently of the written agreements with Pizza Hut." Noel's proper action in contract, if any such contract existed, would have been against Torres based not on the 1976 and 1981 agreements, but on Torres' alleged promise to take PMI public as an inducement for and in consideration of Noel's investment. However, Noel never alleged the existence or breach of any such contract in his four amended petitions or in his pretrial questionnaire. The district court did not err in granting summary judgment in favor of Torres and PMI on Noel's third-party beneficiary claims.

Id. at 1025 (alteration in original).

The court also rejected plaintiff's argument that the jury's verdict finding liability was inconsistent with its finding of no damages, stating:

> As the defendants contend, . . . the verdict could be explained in [several] ways. The jury may have concluded that: (1) Noel failed to prove that the breaches of fiduciary duty caused the failure of PMI to go public and, thus, failed to prove[] that the defendants caused his damages; (2) Noel offered insufficient proof of his alleged damages; or (3) Noel's 1990 sale of his PMI stock was an unreasonable act of "mitigation" according to his own damages model and, had he acted reasonably, he would have suffered no damages. We will consider these possibilities briefly.
>
> . . . .

Torres and PMI plainly emphasized "no causation" to the jury during closing argument. . . . Reinemund's testimony [that Pizza Hut, Inc. never intended to approve PMI's proposed public offering] offers at least some support for that line of argument, and that argument drew no objection from the plaintiffs. . . . Other PMI shareholders, including Torres, sold their shares two years after Noel's sale to Pizza Hut and PepsiCo for over $21 per share. The jury's verdict may be explained based on a finding of no causation.

Torres and PMI further contend that the jury may have found insufficient evidence of Noel's damages or a failure by Noel to reasonably mitigate his damages. These contentions need not be considered in detail since we have already found one plausible explanation for the jury's verdict.

Id. at 1023-24.

## II

Almost two years later, in July 1997, plaintiff brought this legal malpractice action against his former attorneys in the Colorado state court, arguing that their negligent acts caused him damage in his settlement with PepsiCo and in his trial against PMI and Torres. Plaintiff alleged that defendants were negligent in (1) failing to object to evidence regarding plaintiff's prior financial and investment history; (2) putting forth a theory of damages that was not supported by plaintiff's factual history; (3) failing to timely raise legal contentions in support of a motion for new trial; (4) failing to timely assert a claim for punitive damages; (5) failing to appropriately call and examine witnesses; (6) failing to properly counsel plaintiff regarding his settlement with

-8-

PepsiCo; (7) failing to properly advise plaintiff regarding the tax consequences of his settlement; and (8) failing to advise plaintiff of the statute of limitations on claims against another attorney. In December 1997 the case was removed to the federal district court on diversity grounds.

After a scheduling conference, the magistrate judge to whom the case was assigned set a March 15, 1999 deadline for disclosing expert witnesses. On March 16, 1999, plaintiff filed for an extension of time to designate his expert witnesses. The deadline was extended, and on April 16, 1999, plaintiff filed his expert witness disclosure identifying Stanley Oyler as his expert. Although Oyler's testimony was originally supposed to cover all of plaintiff's negligence allegations, his opinions were eventually narrowed to two topics: defendants' alleged negligence in presenting a damage model that was not based on plaintiff's investment history, thereby allowing prejudicial financial evidence to be introduced, and defendants' alleged negligence in failing to seek punitive damages in a timely manner.

Over the next year, the parties filed a multitude of motions regarding discovery disputes, protective orders, motions to dismiss, and motions for summary judgment. In October 1999, plaintiff's attorney withdrew from the case because plaintiff had filed a malpractice action against him arising out of a

different proceeding, and in December 1999, plaintiff's current counsel entered his appearance.

On June 9, 2000, plaintiff attempted to endorse another expert witness, Kenneth Morris, who intended to testify that defendants were negligent in failing to plead a breach of contract claim based on Torres' alleged promise to take PMI public as an inducement for plaintiff's investment in the corporation. Morris' opinion rested on the Kansas Supreme Court's decision indicating that plaintiff should have pled a direct contract claim instead of a third-party beneficiary claim. Defendants filed a motion to preclude this testimony on the grounds that the deadline for disclosing experts had passed more than a year earlier and the proposed expert's testimony involved an allegation of negligence that had not been included in the complaint or in any subsequent pleading. Following a hearing in September 2000 the district court granted defendants' motion to preclude Morris' testimony.

Defendants also filed a motion to disqualify Stanley Oyler from testifying as an expert based on the Supreme Court's decisions in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Although the district court initially denied this motion, it later granted defendants' motion to reconsider, and on November 22, 2000, the court disqualified Oyler as an expert and granted defendants' motion for summary

judgment based on plaintiff's lack of expert testimony. The district court denied plaintiff's motion to alter or amend judgment, and plaintiff appealed.

### III

Plaintiff argues first that the district court erred in refusing to allow Kenneth Morris to testify as an expert and to present a new negligence claim, that the failure to identify this claim earlier was due to the negligence of his first attorney, and that the interests of justice require allowing Morris' late endorsement. We review the district court's exclusion of a witness' testimony based on a discovery violation for an abuse of discretion. Orjias v. Stevenson, 31 F.3d 995, 1005 (10th Cir. 1994).

Rule 26(a)(2) of the Federal Rules of Civil Procedure requires parties to disclose written reports for all of their expert witnesses "at the times and in the sequence directed by the court." Fed. R. Civ. P. 26(a)(2)(C). In this case, plaintiff was required to disclose Kenneth Morris' intended testimony by April 16, 1999. The disclosure of Morris more than a year later, on June 9, 2000, violated the requirements of Rule 26(a)(2).

Rule 37 requires the district court to exclude a witness who has not been disclosed pursuant to Rule 26(a) if the failure to disclose was "without substantial justification," unless the violation was harmless. Fed. R. Civ. P. 37(c)(1). The alleged negligence of plaintiff's first attorney is not a substantial justification for

the late disclosure.    See Link v. Wabash R.R.  , 370 U.S. 626, 633-34 (1962) (rejecting the argument that sanction should not have been imposed because it was the attorney, not the client, who committed the error, noting that a client is responsible for the omissions of his freely selected attorney and that any other result would be inconsistent with a system of representative litigation).

Given that the alleged error of failing to raise a direct contract claim was identified by the Kansas Supreme Court in its 1995 decision, plaintiff has not explained why his new attorney did not raise the issue upon taking over this case in December 1999.  Contrary to plaintiff's argument, defendant Martin's deposition response and supplemental answers did not somehow raise the issue, as Martin discussed only the strength of the third-party beneficiary claim, and not a direct contract claim.  The district court also found that plaintiff's late disclosure of his expert and the injection of a new theory into a case that was almost three years old, where discovery had been completed, was prejudicial.

We therefore conclude the district court did not abuse its discretion in precluding plaintiff from using Morris as an expert.

**IV**

Plaintiff argues that the district court erred in disqualifying Stanley Oyler as an expert in this case.  We review the disqualification of an expert under Daubert  and Kumho Tire Co.   for an abuse of discretion.    Atlantic Richfield Co. v.

-12-

Farm Credit Bank of Wichita, 226 F.3d 1138, 1163 (10th Cir. 2000). The court's determination will be overturned only if it is "arbitrary, capricious, whimsical, or manifestly unreasonable." Id. (quotation omitted).

Daubert and Kumho Tire Co. impose a "special obligation" on the district court to ensure that proposed expert testimony is both relevant and reliable. Kumho Tire Co., 526 U.S. at 147. Here, based on Oyler's affidavit and deposition testimony, the district court held that his proposed expert testimony was not reliable. Specifically, the district court held that (1) Oyler's opinion that the lost earnings appreciation model was really prejudgment interest, which is precluded by Kansas law, was plainly incorrect based on cases like Miller v. Botwin, 899 P.2d 1004, 1012-13 (Kan. 1995), and Henderson v. Hassur, 594 P.2d 650, 660 (Kan. 1979); (2) Oyler's opinion that defendants were negligent in using the lost earnings appreciation model was unreliable because Oyler did not have an appropriate background to evaluate counsel's decision, he did not do adequate preparation to be able to form a legitimate opinion, and his opinion that the outcome of the trial would have been different was totally unsupported; and (3) because the jury did not award compensatory damages to plaintiff, the issue of whether a punitive damages claim should have been pled was moot. On appeal, plaintiff argues only that the court's second ruling is flawed.

Plaintiff argues that Oyler, as a trial lawyer, was qualified to testify that a reasonable attorney would not present a damage theory that is unsupported by the facts and which would permit the introduction of contradicting evidence. Thus, plaintiff argues, Oyler did not need to have experience with stock valuation cases, did not need to be familiar with the facts underlying the previous lawsuit, and did not need to establish that use of this theory caused the jury to decide that plaintiff had not suffered damages. Plaintiff's formulation of the issue is too simplistic.

Oyler's opinion rested on several premises. First, he assumed that the jury awarded no damages because they were prejudiced by the evidence of plaintiff's financial history. This premise rested on an assumption that plaintiff otherwise proved that he suffered actual damages from the failure to offer the shares to the public. However, this issue was hotly contested in the underlying trial. Because Oyler never tried a stock valuation case and had no expertise in this area, he was not qualified to evaluate the evidence regarding the value of the PMI stock had it been offered to the public. In addition, because Oyler was totally unfamiliar with the stock valuation evidence in the prior case, there was nothing to support his assumption that plaintiff proved a loss from the failed public offering.

Next, Oyler's opinion rested on the assumption that plaintiff had not invested previously in the stock market. His deposition testimony shows, however, that he was unfamiliar with plaintiff's past investment history

-14-

(Appellant's App. at 154) and that his opinion rested only on the Kansas Supreme Court decision which stated that plaintiff invested in "things other than S & P 500 stocks," Noel, 899 P.2d at 1020. The court did not say that plaintiff never invested in the stock market, however, and there is evidence in the record that plaintiff was a licensed securities dealer, that his financial statements listed stocks and bonds, and that he had invested the money he received from PepsiCo in the stock market. (Appellee's App. at 14.)

Oyler also assumed that plaintiff's past financial records would not have been admitted if the earnings appreciation theory had not been presented. He did not read the trial transcript, and was not familiar with the issues in the case. Without this type of preparation, Oyler's assumption was baseless. Martin's affidavit indicated his belief that the majority of plaintiff's past financial documents would have been admissible as evidence on several different issues. *Id.* at 12-13.

Finally, Oyler's opinion rested on the assumption that the trial result would have been different if the earnings appreciation theory had not been presented. Oyler relied only on defendant Martin's argument to the Kansas Supreme Court that introduction of the financial records was prejudicial. This argument was not evidence, however, and did not provide a factual basis for Oyler's assumption. And, he did not address the reasons identified by the Kansas Supreme Court

-15-

which could explain why the jury awarded no damages. As Oyler did not read the transcript of the trial or review the evidence presented therein, his assumption that introduction of the financial records was outcome determinative was simply speculation, which is not permitted under Daubert jurisprudence. We conclude that the district court was well within its discretion to disqualify Oyler's testimony as unreliable.

**V**

Plaintiff argues that summary judgment should not have been granted because he was not given an opportunity to be heard on the issue. Although the district court granted summary judgment before plaintiff responded to the issue, plaintiff has not shown what he could have argued that would have changed the result. Under Colorado law, an expert is necessary to establish the elements of legal malpractice. See Boigegrain v. Gilbert, 784 P.2d 849, 849-50 (Colo. Ct. App. 1989). The alleged negligence in this case was not "clear and palpable," and this is not an instance in which "the ordinary knowledge of laypersons could . . . be relied upon to provide the requisite standard of care." Id. at 850. Because plaintiff could not prove his case without an expert, summary judgment was proper. See Mitchell v. Gencorp, Inc., 165 F.3d 778, 784 (10th Cir. 1999). For the same reasons, the district court did not err in denying plaintiff's motion to alter or amend.

-16-

All outstanding motions are denied.  The judgment is        **AFFIRMED** .


ENTERED FOR THE COURT



Carlos F. Lucero
Circuit Judge