**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENFH CIRCUIT

---

ROBERT J. MILNE, an individual;
TIMOTHY K. SORROW, individually
and as personal representative on
behalf of his deceased son, Samuel B.
Hall,

      Plaintiffs-Appellants,

v.

USA CYCLING INC., a Colorado
corporation, d/b/a National Off-road
Bicycle Association; CYCLE
CYNDICATE INC., a Colorado
Corporation; ERIC JEAN, an
individual,

      Defendants-Appellees.

No. 07-4247

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:05-CV-00675-TS)**

---

Steve Russell (Jordan Kendall with him on the briefs) of Eisenberg & Gilchrist,
Salt Lake City, Utah, for Plaintiffs-Appellants.

Allan L. Larson (Richard A. Vazquez with him on the briefs) of Snow,
Christensen, & Martineau, Salt Lake City, Utah, for Defendants-Appellees.

---

Before **McCONNELL, EBEL,** and **GORSUCH**, Circuit Judges.

**EBEL**, Circuit Judge.

This diversity jurisdiction case involves Utah state law claims of negligence, gross negligence, and wrongful death based on a tragic accident that occurred during a bicycle race called the "Tour of Canyonlands" near Moab, Utah. During the race, one or more of the racers collided with an SUV and trailer driving in the opposite direction. One racer was killed, and another was badly injured. The injured rider and the decedent's mother—in her own capacity and on behalf of her son's estate—filed suit against the race's organizers and the entities responsible for promoting and overseeing the race.

The district court granted defendants' motion to strike plaintiffs' expert's second affidavit, and granted summary judgment for the defendants on all claims. On appeal, the plaintiffs only challenge the district court's decision to exclude their expert's opinion and to grant summary judgment for the defendants on the plaintiffs' claims of gross negligence.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM.

## I. BACKGROUND[1]

---

[1] Because this case comes to us on defendants' motion for summary judgment, we construe all facts in plaintiffs' favor. See Beardsley v. Farmland Co-Op, Inc., 530 F.3d 1309, 1313 (10th Cir. 2008) ("This court reviews the

(continued...)

The "Tour of the Canyonlands" ("TOC") is a cross-country mountain bike race through the canyons outside Moab, Utah. The race begins on six miles of an "open course" dirt road, where racers share the road with automobile traffic, and continues for another nineteen miles on rugged off-road paths. On April 25, 2005, two racers—Samuel B. Hall and Robert J. Milne—were racing the TOC when they struck a Ford Excursion SUV, and the trailer it was pulling, on the six-mile open course portion of the race. Mr. Hall died at the scene from severe head trauma. Mr. Milne was seriously injured, but survived the accident.

Following the accident, Plaintiff-Appellant Timothy Sorrow brought negligence, gross negligence, and wrongful deaths claims personally and on behalf of the estate of her deceased son, Mr. Hall, against the people and entities responsible for organizing the race. Plaintiff-Appellant Robert J. Milne brought claims of negligence and gross negligence on his own behalf against the same defendants.

The three Defendants-Appellees were responsible for organizing, promoting, and overseeing the TOC race on April 25, 2005. U.S.A. Cycling Inc., d/b/a the National Off-Road Bicycle Association ("NORBA"), oversaw the race and drafted the rules governing the race, Cycle Cyndicate organized and promoted

---

[1](...continued)
district court's summary judgment decision *de novo*, viewing the evidence in the light most favorable to the non-moving party . . . ." (quoting Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 679-80 (10th Cir. 2007)) (ellipses in original).

the race, and Eric Jean—the president and CEO of Cycle Cyndicate—played a large role in administering and supervising the race.

### A. Open Course Mountain Bike Racing

Although a portion of this race took place on an open road, the race was governed exclusively by the mountain bike racing rules developed by NORBA. These rules differ significantly from road racing rules. For example, road racers must obey a "center-line rule," and may be disqualified if they cross over the line painted in the middle of the road. Mountain bike racers, on the other hand, will not be disqualified for crossing the center-line. This distinction is based at least in part on the fact that, unlike the roads used for road racing, open-course mountain bike races often take place on dirt roads that do not have a clearly marked center line. Thus, a center-line rule would be difficult, if not impossible, to enforce.

Despite the fact that a mountain bike racer may not be disqualified for crossing the center line, there was evidence that the race organizers told the racers to obey a center-line rule. Even where no center-line rule is in effect, however, racers are expected to be aware of their surroundings, and to veer right if they see oncoming traffic.

Open-course bicycle races are apparently not uncommon in the mountain bike racing world and are especially common in Utah. Mr. Milne testified that

about 25% of the mountain bike races he participated in were "open course" races.  The TOC itself has taken place in part on an open course since at least 1998.

Automobile-bicycle accidents are very uncommon at TOC.  Mr. Jean stated that throughout the more than ten-year history of the race, with races in many of those years having nearly 500 participants, he is aware of only one accident involving a bicyclist and an automobile—the accident that led to this case.  Perhaps because of the low frequency of vehicular accidents, NORBA has no rules dictating that race organizers must regulate traffic on open-course trails to avoid automobile-bicycle collisions.  There was some evidence that, despite the fact that NORBA has no such requirement, Mr. Jean requested permission to close the road to traffic on the day of the race.  Whether or not he made those efforts, it is clear that the permit obtained for the race stated that the race could not stop traffic for more than 15 minutes at a time.[2]

### B.  The Racers

Both Mr. Hall and Mr. Milne were classified as "expert" racers, and had extensive mountain bike racing experience.  They had raced the TOC before, and

---

[2] The race organizers obtained a permit from the Bureau of Land Management ("BLM") for the race.  However, the record indicates that there was a conflict at the time between the BLM and some of the County governments regarding who had control over the roads in the area.  This court expresses no opinion on that conflict.

were familiar with the course. Before each of these races, they knowingly signed liability release forms, which provided that the parties had waived all claims against the race organizers, including claims premised on the organizers' negligence. The releases also specifically mentioned that racers were assuming the risk of collision with vehicles. Those warnings, in combination with the race organizers' pre-race announcements that the first six miles would be on an open course shared with other vehicles, make it clear that Mr. Hall and Mr. Milne knew they could encounter vehicles during their race.

### C. Safety Precautions Taken by the Race Organizers

The race organizers took a number of safety precautions both before and during the race. For example, the race organizers posted a sign warning people in the area of the upcoming race, although that sign had been knocked down at least once during the week the leading up to the race.

On the day of the race, the organizers posted, about a mile and half from the starting line, some attendants whose job it was to warn drivers that a race was taking place, that they might encounter some temporary road closures, and that they would be sharing the road with hundreds of cyclists. Some race organizers also testified that they approached people camped in the area to warn them that a race would be taking place that day. Mr. Konitshek, the driver of the SUV involved in the accident, testified that no one ever came to his campground to

warn of the race that morning, despite the fact that his campground was clearly visible from the road. However, the other members of his party testified that the race organizers warned them about the race as they drove away from their campground.

The race organizers also arranged for 25 "course marshals" to help supervise the race. Some of those marshals were posted near intersections or sharp turns in order to mitigate some of the risks associated with the automobile traffic the racers might encounter. However, no one was assigned to the area right near the accident site, which was relatively straight and wide. Further, even though some course marshals had been assigned to areas between the starting line and the place of the accident, some witnesses testified that they did not notice anyone directing traffic in that area. In addition to the course marshals, Mr. Jean had a few people available to administer first aid to injured riders. Mr. Jean himself also carried a backpack with some medical equipment.

Finally, the race organizers made significant efforts to inform the racers that they might encounter vehicles during the race. In order to ride, race participants had to sign a liability release waiver that specifically mentioned the potential for vehicular accidents. Further, before the race began, the race organizers announced that the TOC was an open course race, and that racers might encounter automobile traffic.

**D. The Accident**

Mr. Konitshek was driving a 2001 Ford Excursion with a 30-foot trailer about five miles from the starting line when he noticed that a group of bikers were approaching his car from the opposite direction. The bikers were spread out too wide for their lane of travel. That portion of the road was relatively wide, open, and fast. The visibility there was also relatively good. Although the view was partially blocked by some rocks, Mr. Konitshek's SUV and trailer were visible to racers from at least 150 feet away. Mr. Konitshek testified that, when he saw the oncoming bikers, he veered as far right in his lane of travel as possible, and remained on the right side of the road the entire time.[3] He was going about 5 miles per hour when one of the bikers hit his left sideview mirror, causing it to bang into his window and shatter.

Casey Byrd, a rider who was just behind Mr. Hall and Mr. Milne when the accident occurred, testified that right before the accident, Mr. Hall had attempted to pass both himself and Mr. Milne. Mr. Byrd was immediately behind Mr.

---

[3] There was conflicting evidence on whether Mr. Konitshek or the racers had crossed the center line of the road. Mr. Konitshek was adamant that he had remained on his side. However, one of the riders witnessing the accident testified that the riders remained on their side of the road, although he then recanted his testimony to some extent, stating that it was hard to tell whether the riders and/or the truck had remained on their respective sides of the road. Another rider testified at his deposition that he was certain that Mr. Konitshek's SUV extended beyond the center line. Still another testified that the SUV certainly remained on its side of the road the entire time. For purposes of this appeal, we will assume the facts most favorable to Plaintiffs' argument.

Milne, so Mr. Hall passed him first. Mr. Byrd testified that Mr. Hall passed very closely and, because of his proximity and his speed—Mr. Hall was riding about 25 miles per hour at that time—Mr. Casey could feel the wind coming off him as he passed. Then, as Mr. Hall began to pass Mr. Milne, their handlebars locked together, causing them to veer left and strike Mr. Konitshek's camper. It is not entirely clear what happened next, but at least one racer testified that he saw the trailer run over Mr. Hall.

### E. The District Court's Decision

The district court granted summary judgment for the defendants on all claims. On the plaintiff's gross negligence claims, the court determined that the undisputed facts showed that defendants had taken a number of steps to protect the racers' safety, and even if those steps were taken negligently, they were not grossly negligent. The district court also struck plaintiffs' expert's second affidavit, finding that plaintiffs' witness was not qualified to testify as an expert on mountain bike races. This appeal, challenging the district court's grant of summary judgment on plaintiffs' gross negligence claims and the court's decision to strike plaintiffs' expert, timely followed.

## II. Discussion

### A. Federal Law Dictates Summary Judgment Standard

Before turning to the facts of this case, this court must address whether Utah's summary judgment rules preclude this court from upholding the district court's grant of summary judgment. Under federal law, a defendant may be granted summary judgment whenever plaintiffs fail adequately to "support one of the elements of their claim upon which they ha[ve] the burden of proof." Jensen v. Kimble, 1 F.3d 1073, 1079 (10th Cir. 1993).

Utah's approach to summary judgment is generally parallel to the federal courts' approach. See, e.g., Burns v. Cannondale Bicycle Co., 876 P.2d 415, 418-20 (Utah Ct. App. 1994) (affirming summary judgment for defendants because plaintiff failed to bring evidence supporting one of the elements regarding which it had the burden of proof). However, Utah has a special rule for summary judgment in negligence cases that differs significantly from federal law. Under Utah law, "[s]ummary judgment in negligence cases, including gross negligence cases, is inappropriate unless the applicable standard of care is fixed by law." Pearce v. Utah Athletic Foundation, 179 P.3d 760, 767 (Utah 2008) (emphasis added) (internal quotation omitted). In other words, Utah courts would prevent either party to a negligence dispute from obtaining summary judgment where the standard of care applicable to that dispute has not been "fixed by law." See Berry v. Greater Park City Co., 171 P.3d 442, 449 (Utah 2007) (explaining that Utah courts will not grant summary judgment in a gross negligence case where the applicable standard of care has not been fixed by law because "[i]dentification of

- 10 -

the proper standard of care is a necessary precondition to assessing the degree to which conduct deviates, if at all, from the standard of care—the core test in any claim of gross negligence"); but see RJW Media, Inc. v. CIT Group/Consumer Finance, Inc., 202 P.3d 291, 296 (Utah Ct. App. 2008) (affirming grant of summary judgment for defendant in a negligence case where the standard of care had not been "fixed by law" but the defendant had presented uncontested evidence of the appropriate standard of care).

In Pearce, 179 P.3d 760, the most recent Utah Supreme Court case to consider this issue, the plaintiff brought gross negligence claims arising out of injuries that occurred during a bobsled ride. The Utah court reversed the lower court's grant of summary judgment for the defendants, concluding that summary judgment was inappropriate because the applicable standard of care had not been "fixed by law." The court held that the generally applicable "reasonably prudent person" standard was insufficiently specific to constitute a standard of care "fixed by law." Id. at 768 n.2. Rather, for the standard of care in that case to be "fixed by law," a statute or judicial precedent must articulate "specific standards for designing, constructing, and testing a bobsled run for the public or for operating a public bobsled ride." Id.; see also Berry, 171 P.3d at 449 (denying motion for summary judgment in negligence case involving a skiercross course because the applicable standard of care was not "fixed by law"); Wycalis v. Guardian Title of Utah, 780 P.2d 821, 825 (Utah. Ct. App. 1989) (stating that "the applicable

- 11 -

standard of care in a given case may be established, as a matter of law, by legislative enactment or prior judicial decision"). Since no statute or precedent provided a standard of care for bobsled rides, the Utah court denied the defendants' motion for summary judgment. Pearce, 179 P.3d at 768.

Applying Utah law to this case would probably require that we reverse the district court's grant of summary judgment. It is undisputed that no Utah precedent or legislative enactment specifically establishes the standard of care for running mixed-course bicycle races. Thus, under Utah law, the standard of care in this case is not "fixed by law," and summary judgment would be inappropriate.

Under federal law, on the other hand, a defendant need not establish that the standard of care specific to the factual context of the case has been "fixed by law" in order to be granted summary judgment. See Gans v. Mundy, 762 F.2d 338, 342 (3rd Cir. 1985) (holding that defendant moving for summary judgment in a legal malpractice claim need not present expert testimony establishing a standard of care even though a plaintiff in that position would need to do so, because the case law establishing the plaintiff's duty to provide expert testimony "cannot fairly be characterized as applying to a *defendant's* motion under Rule 56") (emphasis in original); see also id. at 343 ("[T]he party moving for summary judgment has the ultimate burden of showing the absence of a genuine issue as to any material fact. But once the appellees averred facts and alleged that their conduct was not negligent, a burden of production shifted to the appellant to

proffer evidence that would create a genuine issue of material fact as to the standard of care.") (citations omitted); see generally Young v. United Auto. Workers Labor Employment and Training Corp., 95 F.3d 992, 996 (10th Cir. 1996) ("A party who moves for summary judgment under Rule 56 is not required to provide evidence negating an opponent's claim.  Rather, the burden is on the nonmovant, who must present affirmative evidence in order to defeat a properly supported motion for summary judgment.") (citations and quotations omitted).

On the contrary, federal courts will sometimes grant summary judgment to defendants on negligence claims precisely because of the plaintiff's failure to present evidence establishing a standard of care as part of its burden of proof on an element of plaintiff's case.  See, e.g., Briggs v. Washington Metro. Area Transit Auth., 481 F.3d 839, 841 (D.C. Cir. 2007) (affirming grant of summary judgment for defendants on a negligence claim where plaintiff, who under state law had the burden to provide expert testimony on the standard of care, failed to "offer creditable evidence sufficient to establish a controlling standard of care"); Keller v. Albright, 1 F. Supp. 2d 1279, 1281-82 (D. Utah 1997) (granting defendant's motion for summary judgment on plaintiff's legal malpractice claim asserted under Utah law because the plaintiff failed to provide expert testimony regarding the standard of care, and the case did not involve circumstances "within the common knowledge and experience of lay jurors") (citation and quotation omitted), aff'd, No. 97-4205, 1998 WL 163363 (10th Cir. Apr. 8, 1998)

(unpublished) (affirming "for substantially those reasons set out in the district court's [opinion]").  Thus, even when Utah substantive law was involved, the federal district court of Utah and the Tenth Circuit have held that the federal courts may grant a defendant summary judgment on a negligence claim even if the parameters of the standard of care in the relevant industry have not been previously established by precedent or statute.[4]  See also Noel v. Martin, No. 00-1532, 21 F. App'x 828, 836 *7 (10th Cir. Oct. 19, 2001) (unpublished) (upholding summary judgment for defendants in a legal malpractice case where the district court properly dismissed plaintiff's only expert on the issue of the standard of care).

In Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002), this court addressed a closely analogous set of facts involving a conflict between federal and state law standards for granting summary judgment.  Foster involved a retaliatory discharge case brought pursuant to Kansas law.  Id. at 1190-91.  Under Kansas law, a plaintiff can prevail at trial if she establishes her case with "clear and convincing evidence."  Id. at 1194 (internal quotation omitted).  However, Kansas law provides that "a plaintiff in a retaliation case . . . . can successfully oppose a motion for summary judgment by a preponderance of the evidence."  Id. at 1194 (internal quotation and citation omitted).  In Foster, this court rejected the

_____

[4] Admittedly, there is no indication in Keller v. Albright, 1 F. Supp. 2d 1279, that the plaintiff there argued that the Utah standard for granting summary judgment in a negligence claim should apply.

- 14 -

plaintiff's efforts to have that lower evidentiary standard apply at the summary judgment stage in federal court. Id. at 1194-95. Instead, this court held that the Supreme Court's opinion in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), required that courts "view the evidence through the prism of the substantive evidentiary burden." Id. at 254; see also Silkwood v. Kerr-McGee Corp., 769 F.2d 1451, 1454-55 (10th Cir. 1985) (stating, in the context of a motion for judgment notwithstanding the verdict, that "the question of the sufficiency of the evidence needed to go to the jury in a diversity case is a matter of federal law"); Bank of Cali., N.A. v. Opie, 663 F.2d 977, 979 (9th Cir. 1981) ("[F]ederal law alone governs whether evidence is sufficient to raise a question for the trier-of-fact."). Applying that standard to the case before it, this court in Foster held that, at summary judgment, the plaintiff "must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer." Foster, 293 F.3d at 1195. See also Conrad v. Bd. of Johnson County Comm'rs, 237 F. Supp. 2d 1204, 1266-67 (D. Kan. 2002) (holding that, for state law retaliatory discharge claims, the "clear and convincing standard is applied at the summary judgment stage—at least when the claim is brought in a federal court sitting in diversity"). Thus, although the state law dictated that a plaintiff alleging retaliatory discharge could avoid summary judgment under a preponderance of the evidence standard, federal law required that the substantive

standard applied at trial (i.e., clear and convincing evidence) governs summary judgment determinations. See Hanna v. Plumer, 380 U.S. 460 (1965); McEwen v. Delta Air Lines, Inc., 919 F.2d 58, 60 (7th Cir. 1990) ("Federal courts may grant summary judgment under Rule 56 on concluding that no reasonable jury could return a verdict for the party opposing the motion, even if the state would require the judge to submit an identical case to the jury."); 10A Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, Federal Practice and Procedure § 2712 (3d ed. 1998) ("[I]n diversity-of-citizenship actions questions relating to the availability of summary judgment, such as whether there is a disputed issue of fact that is sufficient to defeat the motion, are procedural and therefore governed by Rule 56, rather than by state law.").

The circumstances of this case are very similar to what we addressed in Foster. Like the evidentiary rule in Foster, Utah's rule foreclosing summary judgment in cases where the standard of care has not been fixed by law applies exclusively at summary judgment. This is clear because Utah law provides that, at trial, the plaintiff has the burden of demonstrating the appropriate standard of care. See Webb v. Univ. of Utah, 125 P.3d 906, 909 (Utah 2005) ("To establish a claim of negligence, the plaintiff must establish . . . that the defendant owed the plaintiff a duty [and] that the defendant breached that duty . . . .") (citations and quotations omitted); Sohm v. Dixie Eye Ctr., 166 P.3d 614, 619 (Utah Ct. App. 2007) ("To sustain a medical malpractice action, a plaintiff must demonstrate . . .

the standard of care by which the [physician's] conduct is to be measured . . . ."

(quoting Jensen v. IHC Hosps., Inc., 82 P.3d 1076, 1095-96 (Utah 2003))

(alteration in original)); see also Model Utah Jury Instructions, Second Edition,

CV301B (2009), http://www.utcourts.gov/resources/muji/ (stating that "to

establish medical malpractice" a plaintiff "has the burden of proving," inter alia,

"what the standard of care is"); id. at CV302 (putting the same burden of proof on

a plaintiff attempting to prove nursing negligence). By allowing the plaintiff to

avoid summary judgment in cases where the standard of care has not been fixed

by law, Utah has created a rule very similar to Kansas's rule allowing plaintiffs to

avoid summary judgment under a lesser standard of proof than they would carry

at trial. We are, therefore, bound to treat Utah's unique summary judgment rule

in the same way that we treated the rule in Foster, and conclude that, although we

will look to Utah law to determine what elements the plaintiffs must prove at trial

to prevail on their claims, see Oja v. Howmedica, Inc., 111 F.3d 782, 792 (10th

Cir. 1997) (stating that "in a diversity action we examine the evidence in terms of

the underlying burden of proof as dictated by state law"), we will look

exclusively to federal law to determine whether plaintiffs have provided enough

evidence on each of those elements to withstand summary judgment.[5] As we

_____

[5] Even if the defendants have some burden to establish that the race was run in accordance with the standard of care in order to be granted summary judgment, they have met that burden controlling. The defendants put on evidence from a number of experienced biking participants that this race was carefully run in

(continued...)

discuss in the following section, this approach leads us to concur with the district

court's decision granting summary judgment for the defendants.

## B. Plaintiffs Failed to Provide Evidence of Gross Negligence

### 1. Standard of Review

[5](...continued)

accordance with the standard of care they have come to expect in mountain-bike races. Once the testimony of plaintiffs' expert Sean Collinsworth is excluded, as we hold later was appropriate, plaintiffs put on no conflicting evidence from any witness qualified to articulate a proper standard of care for a mountain bike race. Further, under Utah law, it would probably be unnecessary for defendants to present expert testimony to establish compliance with the standard of care in this case. Compare Collins v. Utah State Dev. Ctr., 992 P.2d 492, 494-95 (Utah Ct. App. 1999) (holding that expert testimony was not necessary in case involving claim that a center working with the developmentally disabled was negligent for allowing a resident to ride a swing without any safety devices designed to ensure that she would not fall off), and Schreiter v. Wasatch Manor, Inc., 871 P.2d 570, 574-75 (Utah Ct. App. 1994) (holding that expert testimony was not necessary in a case involving allegations that a senior living center was negligent for failing to install a fire sprinkler system), with Macintosh v. Staker Paving and Const. Co., 2009 WL 953712, *1 (Utah Ct. App. Apr. 9, 2009) (unpublished) (holding that expert testimony was needed to establish the standard of care in a case involving traffic control at a construction site because of the complex rules governing traffic control in that context); see generally Preston & Chambers, P.C. v. Koller, 943 P.2d 260, 263 (Utah Ct. App. 1997) ("Expert testimony is required where the average person has little understanding of the duties owed by particular trades or professions, as in cases involving medical doctors, architects, and engineers.") (citations and quotations omitted). In any event, plaintiffs have cited no law establishing that Utah would require an expert in this case, and have not addressed this question in their briefs, so this issue is not before us on appeal. Thus, even if the defendants have the burden at summary judgment to establish that there is no genuine dispute of fact that their conduct satisfied the applicable standard of care, we hold that on this summary judgment record, defendants satisfied that burden.

"This court reviews the district court's summary judgment decision de novo, viewing the evidence in the light most favorable to the non-moving party . . . ." Beardsley v. Farmland Co-Op, Inc., 530 F.3d 1309, 1313 (10th Cir. 2008) (quoting Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 679-80 (10th Cir. 2007)) (ellipses in original). "Summary judgment is appropriate if the record evidence shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1255 (10th Cir. 2005) (citing Fed. R. Civ. P. 56(c)). This court will grant summary judgment for a defendant if the plaintiff fails adequately "to support one of the elements of their claim upon which they ha[ve] the burden of proof." Jensen, 1 F.3d at 1079. A plaintiff "cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor." Turner v. Public Serv. Co. of Colo., 563 F.3d 1136, 1142 (10th Cir. 2009) (citation omitted).

### 2. Analysis

The parties agree that, under Utah law, the liability releases signed by Mr. Milne and Mr. Hall preclude the plaintiffs from bringing ordinary negligence claims against the defendants. See Pearce, 179 P.3d at 765 (stating that "people may contract away their rights to recover in tort for damages caused by the ordinary negligence of others"); see also id. at 766 (holding that "recreational

activities do not constitute a public interest and that, therefore, preinjury releases for recreational activities cannot be invalidated under the public interest exception"). However, the plaintiffs argue—and, on appeal, the defendants do not contest—that, under Utah law, a liability release will not prevent a plaintiff from bringing claims of gross negligence. Cf. Hawkins ex rel. Hawkins v. Peart, 37 P.3d 1062, 1065 (Utah 2001) (stating in dicta that a liability release "is always invalid if it applies to harm wilfully inflicted or caused by gross or wanton negligence") (quoting 6A Arthur L. Corbin, Corbin on Contracts, § 1472, at 596-97 (1962)). Thus, the only merits issue raised on appeal is whether plaintiffs have offered enough evidence in support of their claims of gross negligence to withstand a motion for summary judgment.[6]

Under Utah law, "[g]ross negligence is the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." Moon Lake Elec. Ass'n, Inc. v. Ultrasystems W. Constructors, Inc., 767 P.2d 125, 129 (Utah Ct. App. 1988) (quoting Atkin Wright & Miles v. Mountain States Tel. & Tel. Co., 709 P.2d 330, 335 (Utah 1985)) (emphasis added); see also Pearce, 179 P.3d at 767 (same). Thus, "the

---

[6] Aside from her negligence and gross negligence claims, Plaintiff Sorrow also brought wrongful death claims relating to Mr. Hall's death. However, the appellants have not adequately addressed those claims on appeal, so they will be deemed to have been waived. See United States v. Abdenbi, 361 F.3d 1282, 1289 (10th Cir. 2004) ("The failure to raise an issue in an opening brief waives that issue.").

task confronting a plaintiff who claims injury due to a defendant's gross negligence is markedly greater than that of a plaintiff who traces his injury to ordinary negligence. Gross negligence requires proof of conduct substantially more distant from the appropriate standard of care than does ordinary negligence." Berry, 171 P.3d at 449.

"Whether an actor's conduct constitutes negligence is generally a factual question left to a jury. The question should only be answered by the court in rare cases where the evidence is susceptible to only one possible inference." Roberts v. Printup, 422 F.3d 1211, 1218 (10th Cir. 2005) (citations and quotations omitted). However, appeals courts have affirmed grants of summary judgment on gross negligence claims where the undisputed evidence showed that the defendants took precautionary measures and did not ignore known and obvious risks. Cf. Milligan v. Big Valley Corp., 754 P.2d 1063, 1069 (Wyo. 1988) (affirming summary judgment for defendants on "willful and wanton misconduct" claim, holding that the defendants "did not act in utter disregard of" plaintiffs' safety in organizing a ski race where the race organizers had taken a number of safety precautions, plaintiffs presented no evidence that there was a preexisting requirement to take additional precautions, and the racers had been notified in advance of the dangers of the race); Santho v. Boy Scouts of Am., 857 N.E.2d 1255, 1262-63 (Ohio Ct. App. 2006) (affirming directed verdict on claim of recklessness arising from an ice skating race in part because race organizers took

some safety precautions and there was no evidence that organizer had knowingly disregarded any specific dangers or contravened any industry standards).

In this case, the plaintiffs have fallen short of producing evidence upon which a jury could conclude that the defendants failed to exercise "even slight care" in organizing and administering this race. <u>Moon Lake Elec. Ass'n, Inc.</u>, 767 P.2d at 129.

Mountain bike racing is an inherently dangerous sport, so the defendants cannot be considered grossly negligent merely because they organized a race that placed the racers at risk of injury and even death. Rather, the court must look at the specific steps the defendants took to ensure the racers' safety in order to determine whether a jury could decide that they were grossly negligent.

As discussed above, the undisputed evidence shows that the race organizers took a number of steps to warn of, and protect against, the risk of an automobile accident during the race. The race organizers posted a sign warning people in the area of the upcoming race, posted attendants near the starting line to warn drivers about the race taking place that day, and approached people camped in the area to warn them that the road would be clogged with bikers that morning.

The race organizers also provided 25 course marshals, some of which were assigned to areas like intersections and sharp turns specifically because of the unique risks of automobile traffic in those areas. No one was assigned to the area right near the accident, but that choice was not grossly negligent in light of the

fact that the stretch of road where the accident occurred was relatively straight and wide. The race organizers also had some first aid personnel standing by, in addition to Mr. Jean, who carried a backpack with some medical supplies.

Finally, the racers were warned—both in writing and verbally—that they might encounter traffic during the race. The racers' decision to compete on a course that they knew they would be sharing with automobiles strongly undercuts their ability to claim after the fact that it was grossly negligent for the race organizers to conduct an open course race. Cf. Walton v. Oz Bicycle Club of Wichita, No. 90-1597-K, 1991 WL 257088, *4 (D. Kan. Nov. 22, 1991) (granting defendants summary judgment on negligence claim arising from plaintiff striking an automobile during a bicycle race organized by the defendants in part because "the fact that the course was open to normal traffic was explicitly made known to the participants").

Mr. Konitshek claimed that the organizers' efforts to warn people in the area of the upcoming race were ineffective, because he did not know about the race until moments before the accident. Mr. Konitshek's complaints about the sufficiency of the race organizers' warnings do not rise to the level of creating a material issue of fact with regard to gross negligence for two reasons. First, even if the race organizers' warnings were imperfect, that does not negate the fact that they made rather substantial efforts to warn people, and their failure to reach every person in the area is insufficient to show gross negligence. Second,

although Mr. Konitshek testified that he would have changed his plans if he had known about the race in advance, the plaintiffs presented no reason for this court to think that most drivers would change their plans to avoid a bicycle race on a 6-mile stretch of open road.

Utah requires a very high level of disregard for safety in order to constitute gross negligence. See Pearce, 179 P.3d at 767; Atkin Wright & Miles, 709 P.2d at 335; Moon Lake Elec. Ass'n, Inc., 767 P.2d at 129. The undisputed steps that defendants took to enhance the safety of the TOC would prevent any reasonable juror from finding gross negligence under Utah substantive law. Many of the precautions discussed above were specifically designed to prevent accidents with automobiles. Further, there was no evidence that automobile accidents posed a particularly serious risk in this case. On the contrary, the race had been conducted on an open course for over a decade, and this is the first instance of an accident involving a racer and a vehicle. Thus, the organizers' failure to shut down the road, mark and enforce a center line on the road, more closely monitor vehicular traffic, or more thoroughly warn other area drivers of the upcoming race cannot, as a matter of law, amount to gross negligence in light of the other safety steps taken by the organizers of this race. Cf. Holzer v. Dakota Speedway, Inc., 610 N.W.2d 787, 793-94 (S.D. 2000) (affirming summary judgment for defendants on reckless conduct claim relating to harm caused to a pit crew member during an automobile race in part because the allegedly reckless conduct

that led to the harm in that case had been present during races for three years prior to this accident, and had never before caused anyone any harm).

An examination of cases in other jurisdictions shows that courts have been reluctant to find that race organizers have been grossly negligent for failing to take every precaution that 20/20 hindsight might counsel.  See Milligan, 754 P.2d at 1069 (affirming summary judgment for defendants on "willful and wanton misconduct" claim arising out of a ski race where the race organizers had taken a number of safety precautions, plaintiffs presented no evidence that there was a preexisting requirement to take additional precautions, and the racers had been notified in advance of the dangers of the race); Santho, 857 N.E.2d at 1262-63 (affirming directed verdict on claim of recklessness arising from an ice skating race in part because race organizers took some safety precautions and there was no evidence that organizer had knowingly disregarded any specific dangers or contravened any industry standards); Holzer, 610 N.W.2d at 793-94 (affirming summary judgment for defendants on reckless conduct claim relating to harm caused to a pit crew member during an automobile race in part because plaintiff failed to show that, at the time of the accident, the defendants "knew or had reason to know of an unreasonable risk of harm" to the defendant); Walton, 1991 WL 257088 at *4 (granting defendants summary judgment on negligence claim arising from plaintiff striking an automobile during a bicycle race organized by

the defendants in part because "the fact that the course was open to normal traffic was explicitly made known to the participants").

We therefore agree with the district court's determination that the plaintiffs in this case have failed to provide evidence upon which a reasonable jury could conclude that the race organizers were grossly negligent.[7] See Turner, 563 F.3d at 1142 (stating that, to avoid summary judgment, a plaintiff "must proffer facts such that a reasonable jury could find in her favor").

## C.  District Court did not Abuse its Discretion by Excluding Plaintiffs' Expert

### 1.  Standard of Review

"Like other evidentiary rulings, [the court] review[s] a district court's decision to exclude evidence at the summary judgment stage for abuse of discretion."  Sports Racing Serv., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 894 (10th Cir. 1997) (citations omitted).  "[A] district court abuses its discretion when it renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment."  Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1163 (10th Cir. 2000) (citations and quotations omitted).

---

[7] Because we decide this case on the grounds that plaintiffs have failed to present evidence of gross negligence, we do not reach the defendants' separate argument that, even if they were grossly negligent, their negligence could not have proximately caused the harms complained of in this case.

When testing the admissibility of expert testimony, courts must first determine whether an expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion." Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001) (quoting Fed. R. Evid. 702). Second, if the court determines that a witness is qualified, it must then "determine whether her opinions [a]re 'reliable.'" Id.

The district court struck the second affidavit of plaintiffs' expert Sean Collinsworth, concluding that he was "not sufficiently qualified to render expert testimony on the applicable standards of care for mountain bike racing, particularly regarding the TOC[, and] that any such testimony would be speculative and not sufficiently reliable . . . ." (Appx. at 9.)

### 2. Analysis

Plaintiffs rely heavily on their expert's testimony to support their claim that the race organizers were grossly negligent. However, plaintiffs' expert, Sean Collinsworth, admittedly had no experience in organizing, supervising, or studying mountain bike races and, therefore, was not qualified to offer expert testimony on the standard of care for mountain bike races. At his deposition, Mr. Collinsworth was asked, "As a matter of fact—just so we're clear, you're not an expert on mountain bike racing . . . Is that a fair statement?" (Appx. at 641.) He answered, "Yes, it is." (Id.) Nor was he even an experienced mountain bike

rider. He had only participated in one or two mountain bike races, and those were more than 15 years ago. He had never published any articles about bicycle racing of any sort, let alone mountain bike racing. He testified that, as a police officer, he investigated hundreds of vehicle-bicycle collisions, but there was no indication that any of those took place on a dirt road or in the course of a race.

Although Mr. Collinsworth had experience organizing and supervising paved road bike races, the district court reasonably concluded that his experience was insufficient to qualify him to testify about mountain bike races. The facts of this case make it clear that the rules and practices that prevail at mountain bike races—even the on-the-road portion of mountain bike races—are different from the rules and practices that prevail at traditional road races. Most importantly, road racers are always required to obey a center-line rule, while mountain bikers racing on dirt roads will generally cross the center-line when there is no oncoming traffic, but are expected to veer right if they see any traffic approaching. Furthermore, the conditions of a road race on paved streets with clearly marked center lines differ significantly from the conditions of the open-course portion of the TOC, which took place on a dirt road with no clearly marked center line. Given the differences between road races and mountain bike races, we conclude that the district court's finding that Mr. Collinsworth was unqualified to offer expert testimony on the standard of care for mountain bike races was not "arbitrary, capricious, whimsical, or manifestly unreasonable."

Atlantic Richfield Co., 226 F.3d at 1163; cf. Ralston, 275 F.3d at 970-71 (upholding district court's determination that a board certified orthopaedic surgeon was not qualified to testify about an orthopaedic device that she had never worked with or studied); Bertotti v. Charlotte Motor Speedway, Inc., 893 F. Supp. 565, 569-70 (W.D.N.C. 1995) (striking expert testimony regarding design of go-kart track where expert had experience in automobile racing, but not go-kart racing).

Even if Mr. Collinsworth was qualified to offer an expert opinion on the standard of care for mountain bike races, the district court correctly determined that his testimony in this case was unreliable. "To determine whether an expert opinion is admissible, the district court performs a two-step analysis. First, the court must determine whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion. See Fed. R. Evid. 702. Second, if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable . . . ." 103 Investors I, L.P. v. Square D Co., 470 F.3d 985, 990 (10th Cir. 2006). "In reviewing whether an expert's testimony is reliable, the trial court must assess the reasoning and methodology underlying the expert's opinion." United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006) (citations and quotations omitted). Mr. Collinsworth's opinions in this case were not based on a study of other similar races, an analysis of precautionary measures used in mountain bike races and the risks and benefits of such measures,

or any other empirical or quantitative studies. Instead, he relied almost exclusively on his experience in paved road racing—experience that the district court reasonably determined was inapplicable to the context of mountain bike racing—to form his conclusions about the standard of care that should have been used in this case. Mr. Collinsworth's conclusions about the safety precautions that should have been taken in this case are, therefore, mere speculation, and "[i]t is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." Goebel v. Denver and Rio Grande Western R.R. Co., 215 F.3d 1083, 1088 (10th Cir. 2000). Without their expert's testimony, the plaintiffs' claims fall apart. See Bertotti, 893 F. Supp. at 570 (granting summary judgment for defendants on plaintiffs' claim that defendants were grossly negligent in designing and maintaining a go-kart track where the only evidence plaintiffs provided in support of their claims of gross negligence was inadmissible expert testimony).[8]

---

[8] The district court's holding on this matter was limited to Mr. Collinsworth's second affidavit because the defendants did not also move to strike plaintiffs' expert's initial report or his deposition testimony. However, the district court's ruling clearly indicated that it would not allow this expert to testify as an expert on any of the issues in this case. Therefore, we do not consider either of Mr. Collinsworth's affidavits or his deposition testimony in deciding the merits of plaintiffs' claims.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's decisions to strike the plaintiff's expert's second affidavit and to grant summary judgment for the defendants.

07-4247, *Milne v. USA Cycling Inc.*

**GORSUCH**, Circuit Judge, concurring in part and concurring in the judgment.

I join all but Section II.C of Judge Ebel's fine opinion. That section concerns the admissibility of testimony by the plaintiffs' expert, Sean Collinsworth. The majority upholds the district court's decision to exclude Mr. Collinsworth's testimony on the ground that he wasn't an expert in the relevant field. I have my doubts. Mr. Collinsworth may not be a professional mountain bike racer, but he does have substantial experience in organizing and conducting traffic control operations for bicycle racing and similar events – and the adequacy of the defendants' traffic control operations lie at the heart of this case.

Still, I would affirm the district court's exclusion of Mr. Collinsworth for a different reason. The only question in this case is *gross* negligence – namely, whether defendants took *any* precautions against the accident that took place. *See, e.g.*, *Pearce v. Utah Athletic Found.*, 179 P.3d 760, 767 (Utah 2008) (Gross negligence is "the failure to observe *even slight care*; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result.") (emphasis added); *cf. Berry v. Greater Park City Co.*, 171 P.3d 442, 449 (Utah 2007) ("Gross negligence requires proof of conduct substantially more distant from the appropriate standard of care than does ordinary negligence."). Mr. Collinsworth's proffered testimony faults the sufficiency of the defendants' precautions, but doesn't dispute that the defendants did exercise *some* degree of

care, however slight, in preparing for and managing this race. His testimony, thus, might well have been relevant to a negligence claim, but it doesn't illuminate the plaintiffs' gross negligence claim. And a district court is not obliged to entertain evidence, expert or otherwise, irrelevant to the claims before it. *See* Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."). With this minor caveat, I am pleased to join.